Raymond John **WAGNER**, Anthony Joseph **Cambiano** and Donald **Vandergrift**, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 16000.

United States Court of Appeals Ninth Circuit.

March 2, 1959.

Rehearing Denied April 7, 1959.

See also 250 F.2d 804.

Morris Lavine, Los Angeles, Cal., for appellants.

Laughlin E. Waters, U. S. Atty., Norman W. Neukom, Robert John Jensen, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before CHAMBERS, BARNES and HAMLEY, Circuit Judges.

HAMLEY, Circuit Judge.

On December 19, 1955, the postmaster and assistant postmaster of Bellflower, California, were robbed of $19,342.87 in cash belonging to the United States. Raymond John Wagner, Anthony Joseph Cambiano, and Donald Vandergrift were jointly indicted for this offense. It was charged that in committing the crime they assaulted and put in jeopardy the lives of the two postal officials.[1]

The three defendants were tried together, but the jury was unable to reach a verdict. A second jury trial was had, resulting in verdicts of guilty against all three. Judgments of conviction were then entered, each defendant being sentenced to imprisonment for twenty-five years. They join in this appeal, raising several questions for our consideration.

Three of the specifications of error relate to appellants' unsuccessful efforts before and during the trial to obtain the residence address of persons called for jury service.

---

1. These allegations were intended to invoke Title 18 U.S.C.A. § 2114, which reads as follows:

"Whoever assaults any person having lawful charge, control, or custody of any mail matter or of any money or other property of the United States, with intent to rob, steal, or purloin such mail matter, money, or other property of the United States, or robs any such person of mail matter, or of any money, or other property of the United States, shall, for the first offense, be imprisoned not more than ten years; and if in effecting or attempting to effect such robbery he wounds the person having custody of such mail, money, or other property of the United States, or puts his life in jeopardy by the use of a dangerous weapon, or for a subsequent offense, shall be imprisoned twenty-five years."

Prior to the trial appellants' counsel requested permission from the clerk of the district court to see the clerk's card list of persons called for jury service. This list contained the names and addresses of persons then under call for jury service. According to appellants, it also contained information concerning the citizenship, length of jury service, and occupation of each such person. The clerk refused this request, as he was required to do by reason of a general order of the United States District Court, Southern District of California, issued on February 28, 1951.[2]

At the outset of the trial counsel for appellants requested of the court that they be furnished a list of the names and addresses of prospective jurors. They objected to proceeding with the trial until this was done. The request was denied. Impanelment of the jury was then undertaken, during the course of which counsel for appellants requested the court to ask each prospective juror to state his or her residence address. This request was also refused, but the court had each prospective juror indicate the "approximate community" where he or she resided.[3]

Counsel for appellants stated to the court that information as to the "approximate" location of prospective jurors would not be satisfactory. The court was told that appellants had no intention of disturbing any juror. The exact residence address was needed, counsel asserted, to enable them to ascertain the jurors' "status or character in the vicinage in which they reside," and "whether there is any proximity to any possible witnesses or information." Unless such information was supplied, the court was told, appellants could not "intelligently select the jurors, nor exercise our challenges satisfactorily." The result, they argued, would be to deprive appellants of due process of law guaranteed by the Fifth Amendment.

On this appeal these reasons for requesting this information are again urged. Condemning both the district court's general order of February 28, 1951, and the trial court rulings denying their requests, appellants here invoke not only the Fifth Amendment but also Art. III, § 2, clause 3, and the First, Sixth, and Seventh Amendments of the Constitution.

In the recent case of Hamer v. United States, 9 Cir., 259 F.2d 274, it was held that the refusal of the defendant's request for the names and addresses of persons summoned for jury duty did not, under the facts of that case, constitute a deprivation of the right to trial by jury as guaranteed by Art. III, § 2, clause 3. It was further held that, under the circumstances there existing, refusal of that request did not deprive the defendant of the right to trial by an impartial jury as guaranteed by the Sixth Amendment. In reaching these conclusions the court studied the record of the voir dire examination and found that it was adequate and fair to insure the selection of an impartial jury.

Appellants criticize the Hamer decision, but we reaffirm the principles there announced as summarized above.

We have similarly studied the record of the voir dire examination in this case. The trial court conducted the voir dire in a fair and patient manner. It responded favorably to practically every request of appellants' counsel concerning questions to be propounded to prospective jurors. Appellants do not contend

2. The order of February 28, 1951, reads as follows:
   "It is Hereby Ordered by the Court that neither the Clerk nor the Marshal shall reveal to anyone the names or addresses of persons called for juror duty, or jurors, except (1) Upon prior order of Court, or (2) Where required to do so by any applicable law, or (3) When done in connection with the summoning of or notification to jurors, or as certified in vouchers for payment of jury fees."

3. Information supplied in response to this direction was of this kind: "Boulevard Heights Section, Wilshire District, Los Angeles"; "Bell, California"; "the Rancho Park area in West Los Angeles"; "Beverly Hills"; "West Hollywood"; "Monterey Park."

that the jury selected to try the case was biased or partial in any respect.

■ Applying the Hamer test to the instant case, we are brought to the same conclusion—refusal to make available the residence addresses of prospective jurors has not deprived appellants of their constitutional rights under Art. III, § 2, clause 3, or the Sixth Amendment of the Constitution.

Although the due process clause of the Fifth Amendment was not specifically invoked in Hamer, the test which was there applied and which we have applied equates with the basic premise of that clause.[4] Hence, we conclude that the refusal of appellants' requests for the addresses of prospective jurors has not deprived them of due process of law.

■ Appellants' reliance on the First and Seventh Amendments in connection with the question under discussion is misplaced. The First Amendment places restrictions upon the power of Congress and has no reference to judicial proceedings. The Seventh Amendment has application only in civil cases.

■ Appellants also argue that by virtue of 28 U.S.C.A. § 1864, the names and addresses of prospective jurors are public records, and defendants in criminal cases are therefore entitled to that information as a matter of right.[5]

The cited section makes it clear that members of the public are entitled to be present when the names of grand and petit jurors are drawn. Presumably this would give a person then present an opportunity to copy down the names so drawn. By the use of directories and other sources of information, such a person might then be able to ascertain the addresses of individuals whose names were drawn for jury service.

In our view the fact that a person might be able to acquire this information for himself in the way indicated does not establish his right to have it supplied to him by the government prior to trial. Nor does this fact give him the right to obtain it at the trial through questioning of prospective jurors. If there is such a right, one would expect it to be evidenced by some statutory or constitutional provision. Neither 28 U.S.C.A. § 1864, nor any other statute called to our attention makes provision for the supplying of such information to parties or their counsel, or even mentions the matter of jurors' addresses. We have heretofore stated our reasons for concluding that there is no constitutional requirement that this be done.

In our opinion appellants' inability to obtain the residence addresses of prospective jurors prior to or during their trial does not call for reversal of the judgments of conviction.

■ The trial court's refusal to permit counsel for appellants to ask questions of prospective jurors during the voir dire is specified as error. Appellants argue that the right to question jurors directly is authorized by Rule 24 (a), Federal Rules of Criminal Procedure, 18 U.S.C.A., and that refusal to accord this right is violative of the Fifth, Sixth, and Seventh Amendments. Dennis v. United States, 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734, and Morford v. United States, 339 U.S. 258, 70 S.Ct. 586, 94 L.Ed. 815, are cited in support of this contention.

The trial court refused to permit counsel for appellants to question prospective jurors directly, but offered to propound any questions suggested by counsel. Numerous questions were thereafter suggested by counsel for appellants and each

---

4. As the court said in Hamer (259 F. 2d at page 279):

"* * * Provided that the selection of the jury when viewed as a whole is fair and impartial, such a test would comport with the Supreme Court's view of the basic premise of the due process clauses of the Fifth and Fourteenth Amendments of the Constitution. * * *"

5. The pertinent part of 28 U.S.C.A. § 1864, reads:

"The names of grand and petit jurors shall be publicly drawn from a box containing the names of not less than three hundred qualified persons at the time of each drawing."

such question was propounded and answered.

The procedure followed is in full accord with that outlined in Rule 24(a), quoted in the margin.[6] The constitutionality of such procedure, with particular reference to Art. III, § 2, clause 3, of the Constitution and the Sixth Amendment, was upheld in Hamer v. United States, supra, 259 F.2d at pages 279–280, where ample authority is cited.

In Morford v. United States, supra [339 U.S. 258, 70 S.Ct. 587], a judgment of conviction was reversed because "the trial court did not permit counsel for petitioner to interrogate prospective government employee jurors upon voir dire examination with specific reference to the possible influence of the 'Loyalty Order,' Executive Order No. 9835 [5 U.S.C.A. § 631 note,] on their ability to render a just and impartial verdict." It was pointed out that such questioning was permitted in Dennis v. United States, supra.

There is nothing in the brief per curiam opinion in Morford to indicate that the appellant was there contending that his counsel rather than the trial court should have interrogated the jury. The reversal came not because counsel for appellant was not permitted to make this inquiry, but because it was not made by anyone. As its reason for reversing, the court in Morford called attention to its language in Dennis, supra, that "preservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury."

In the instant case that opportunity was preserved because the trial court offered to and did propound every question appellants wanted to have propounded. Appellants have not suggested how they could have better ascertained the impartiality of the jurors by asking the same questions themselves. No prejudicial error was committed in refusing this request.

Under two other specifications of error appellants question the sufficiency of the evidence, asserting that it did not warrant the jury finding that they were the robbers.

The robbery occurred about 2:30 p. m. on the afternoon of December 19, 1955. Postmaster Martin and Assistant Postmaster Bonner had left the post office at Bellflower to deposit postal funds and checks in a bank at Bellflower. They drove to the bank in a station wagon and parked in a parking lot to the rear of the bank. As the vehicle was brought to a stop, and before either Martin or Bonner could alight, they were accosted by two men—one on either side of the car—each armed with a gun.

Martin identified the armed man who appeared at his side of the car as appellant Vandergrift. The latter demanded Martin's gun, but when Martin reached into his coat to get it, Vandergrift told him to keep his hand out if he did not want to get shot. Martin testified that he was apprehensive for his life and that he felt that his assailant "meant business." Martin's shirt was ripped where the robber's gun had been jammed into Martin's side.

Bonner identified the armed man who approached his side of the car as appellant Wagner. Martin also identified this man as Wagner. Bonner testified that the gun was pointed at him and that he was apprehensive for his life. The man identified as Wagner took the money, and he and the other armed man then crossed the street and got into an Oldsmobile. Both Martin and Bonner identified the driver of the "get-away" car as appellant

6. Rule 24(a), Federal Rules of Criminal Procedure, 18 U.S.C.A., reads as follows:

"*Examination.* The court may permit the defendant or his attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or his attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper."

Cambiano. The robbery was witnessed by Robert Hunt, who identified Cambiano as the driver of the Oldsmobile. He also identified Vandergrift, but later conceded this to be a doubtful identification. The entire robbery took place in a period of about thirty seconds.

The Oldsmobile was later found in a parking lot. One partial fingerprint was found upon it, which, however, did not match the fingerprints of any of the appellants.

Evidence was received to the effect that between December 12 and 18, 1955, sixteen telephone calls were made from Vandergrift's apartment to Cambiano's home. Cambiano's telephone number was a "non-published" number.

Appellants Wagner and Vandergrift produced evidence tending to establish alibis. None of the stolen property was found in the possession of any of the appellants. There was no evidence tending to associate Wagner with Vandergrift or Cambiano prior to the robbery.

■■ The verdict of a jury must be sustained if there is substantial evidence to support it, taking the view most favorable to the government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680. In our opinion the jury finding that all of the appellants were involved in the commission of this crime is supported by substantial evidence.

■ Under the same specification of error appellants argue that the evidence is not sufficient to sustain the jury finding as to each appellant that the lives of the two postal officials were put in jeopardy by the use of dangerous weapons. This finding provided the basis for the imposition of sentences of twenty-five years rather than ten years.[7] If the evidence is found to be insufficient in this respect, only that part of the judgment by reason of which fifteen years were

added to the sentence would be affected. The remedy would be to remand for resentencing rather than to reverse with directions to dismiss the entire action. See Meyers v. United States, 5 Cir., 116 F.2d 601, where a similar procedure was followed, although a plea of guilty to an insufficient indictment was there involved.

■ Appellants contend that the statutory words "puts his life in jeopardy" means something more "than the mere holdup by force or fear," otherwise Congress would not have added this provision to the statute. In appellants' view, the expression "puts his life in jeopardy" means "some physical attack of some kind beyond the mere assault which is normally the part of every robbery."

We agree that the aggravated form of robbery described in the latter part of § 2114 as putting "life in jeopardy by the use of a dangerous weapon" means more than a "mere holdup by force or fear." It must be a holdup involving the use of a dangerous weapon actually so used during the robbery that the life of the person being robbed is placed in an objective state of danger. See United States v. Donovan, 2 Cir., 242 F.2d 61.

Perhaps the most obvious and common way in which a gun may be used to place life in an objective state of danger is by pulling the trigger and firing a shot. But a jury is by no means limited to such a showing as this in order to find that an objective state of danger existed.

Here there is evidence that a gun, which the jury could infer was loaded,[8] was pressed against Martin's side with such force that it ripped his shirt. This was an overt act not necessarily and in fact not ordinarily associated with the commission of a robbery. Had Martin cried out, grappled with his assailant, sought to escape, or refused to hand over the money—or had his assailant mis-

---

7. See 18 U.S.C.A. § 2114, quoted in footnote 1.

8. There was no direct evidence that the gun was loaded. When, however, a robber displays a gun to back up his demands, he

wants his victim to believe that it is loaded, and the fact-finder may fairly infer that it was. Here there was a voiced threat by one of the robbers that Martin would be shot if he did not keep his hand away from his coat pocket.

takenly thought he was offering resistance—Martin's life would probably have been forfeited.

■ We hold that the jury was warranted in finding that the use of the gun in this manner placed Martin's life in an objective state of danger, and so jeopardized his life within the meaning of the statutes. The evidence was therefore sufficient on this branch of the case.

Prior to the first trial appellant Wagner moved for a bill of particulars which would have supplied the names and addresses of persons present at the alleged robbery. It was later stipulated that this motion would also be deemed to be made in connection with the second trial. The motion was denied. During the course of the second trial there was testimony to the effect that at the time of the robbery a man was in a Seven-up truck nearby. The government did not give appellants the name and address of this truck driver. In view of these circumstances appellants argue under their sixth specification of error that the trial court erred in denying the motion for a bill of particulars.

Bonner, one of the victims of the robbery, testified that a Seven-up truck was standing directly behind the robbers' Oldsmobile. After the robbery the driver of this truck gave Bonner the license number of the "get-away" car written on an envelope or a piece of paper. Robert Hunt, another witness called by the government, saw the driver of the Seven-up truck take down the license number of the Oldsmobile. No other record references to the truck driver have been called to our attention.

The record of this trial therefore hardly supports appellants' assertion that "it is clear" that the name of the driver of the Seven-up truck was given to one of the government witnesses and that his name and address were within the knowledge of the government. It is true that the government brief makes reference to this driver as a "Mr. Hall." This reference, however, is based on testimony taken at the first trial which is not in the record before us.

If we do consider that testimony, however, it establishes that appellants could have obtained the information in question prior to the second trial.[9] There is no contention that appellants made such an effort, or that if they did so without success the court was advised of that fact. Nor, even with the disclosure concerning the testimony at the first trial regarding a "Mr. Hall," is it established that the government had the address of the driver of the Seven-up truck.

■ Where a witness is equally available to both parties no inference should be drawn from the failure to produce such a witness. Shurman v. United States, 5 Cir., 233 F.2d 272, 275. On like reasoning, where the name and address of a witness is equally available to both parties, no prejudice results from the denial of a motion requiring one party to supply that information to the other.[10]

Under their ninth specification of error appellants argue that the trial court erred in denying their request that they be permitted to inspect the reports of post office inspectors relating to conversations had with Martin and Bonner during which the inspectors were given descriptions of the robbers. While appellants' brief contains no record references concerning this request,[11] the government brief fortunately supplies this deficiency.

The request in question was made after the government had closed its case

---

9. We are advised that the first trial commenced on July 31, 1956, and concluded on August 6, 1956. The instant trial was begun on January 8, 1957, and ended on January 16, 1957.

10. We do not reach the government's additional contention that in any event the

government, except in capital cases, may not be required to disclose the names of its witnesses.

11. Regarding the duty of an appellant to provide such references, see De Casaus v. United States, 9 Cir., 250 F.2d 150, 153, Judge Pope concurring.

and while appellants' fourth witness was on the stand. Appellants apparently did not request permission to inspect any written report submitted by Martin, Bonner, or any other witness who had testified. What they sought was leave to inspect reports prepared by investigating officers in which, appellants said, there were "gathered" the oral descriptions of the robbers given to the investigators by "the witness called by the prosecution"— presumably Martin or Bonner or both.[12]

The government's objection to this request was sustained. Counsel for appellant Vandergrift then asked for leave to call to the witness stand James K. Hudson, a postal inspector, for the purpose of laying a foundation for the request which had just been denied. The trial court refused to permit him to call Hudson at that time, indicating that Hudson could be called by Vandergrift while the latter was putting on his case.[13]

Neither Vandergrift nor either of the other appellants thereafter called Hudson as a witness during the presentation of his case. The government called Hudson as a rebuttal witness, and he was again called by the government when the government was permitted to reopen its case. On neither of these occasions did appellants cross-examine Hudson in an effort to lay a foundation for the request to inspect the postal inspectors' reports.

Under Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, defendants in a federal criminal prosecution, for purposes of possible impeachment, are entitled to inspect written reports made by government witnesses touching the events and activities as to which they testified at the trial. The same right is extended to oral reports of similar scope by such witnesses as contemporaneously recorded by other authorized government personnel.

■ While the trial court did not indicate its reason for denying the request to see the postal inspectors' reports, there are two reasons why it was proper to do so. The first of these is that the request was not timely. Martin and Bonner, whom appellants sought by this means to impeach, had completed their testimony and had presumably gone on their way. It was then too late, except upon a showing of adequate excuse, to make such a demand. See Rios v. United States, 9 Cir., 256 F.2d 173, 178. No such excuse was offered.

■ The second reason such a request was properly denied is that no sufficient foundation was laid for it. Under the Jencks rule if the report sought to be inspected is not that of the witness to be impeached, it must be a report prepared by an authorized government employee contemporaneously recording an

12. The request was as follows:
    "Mr. Graves: At this time I would like to make a demand upon the government to produce to us for our inspection the report made by the postal authorities to the United States Government in Washington, and the report made by the postal authorities for their own investigation here. I make that demand upon the following grounds, your Honor: That the witness called by the prosecution himself testified as to various descriptions that he gave;
    "(2) He testified that this was gathered into a report, and that the report was gathered by the investigating officers on behalf of the postal authorities;
    "(3) Such a document is in possession of the government;
    "(4) This necessarily contradicts his testimony as to material particulars, to

wit, in the following manner: This man testified that these particular people committed the crime with which the defendants are here charged, yet his description given in that regard varies in particulars with that given here. On the basis of that case, volume 344, page 44 [sic] [Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447], I make a specific demand upon the government to produce that report."

13. The trial court had previously ruled that each defendant in turn was to put on his complete case. Appellant Wagner had then begun to put on his case. However, at the time the request to inspect the reports was made the appellants were putting on, out of order, several police officers and deputy sheriffs whose testimony was of importance to all appellants.

oral statement made to such employee by the witness. See Papworth v. United States, 5 Cir., 256 F.2d 125, 130; Rios v. United States, supra, 256 F.2d at page 177.[14]

Here there was no assertion by counsel for appellants in making the request that there was any report meeting these conditions. Nor was any effort made to ascertain whether such a report was in existence, as by calling Hudson and other postal inspectors for examination as to the nature of the reports they had filed.

It is our opinion that under the circumstances indicated the trial court did not err in denying the request to inspect the reports made by the postal inspectors.

In their tenth specification of error appellants complain of the action of the trial court in giving, and refusing to give, certain instructions.

The language of one or two of the instructions given could have been improved. However, reading the instructions as a whole we find no prejudical error. The trial court did not err in refusing to give certain instructions requested by appellants.

Under a final specification of error appellants complain of trial court rulings overruling an objection to certain questions propounded to a witness, permitting appellant Wagner to be cross-examined to an extent which appellants deemed improper, and permitting the government to reopen its case to put in additional evidence.

The challenged rulings as to these matters represent the exercise of discretion by the trial court. In our view the court did not abuse its discretion and no prejudicial error occurred.

Affirmed.

14. In Papworth the court, 256 F.2d at page 130, said:
"We also conclude that a report made two weeks later by the FBI agents, which included a running summary of the investigation in the language of the agent who prepared it is neither the 'substantially verbatim recital of an oral statement * * * recorded contemporaneously with the making of such oral state-

ment', as required by the statute [18 U.S.C.A. § 3500], nor is it a 'report * * * orally made, *as recorded by the FBI*,' as required under the Jencks decision. The court correctly ruled that the government need not produce the report which was properly identified and produced before us as required by the statute. 18 U.S.C.A. § 3500."