UNITED STATES of America, Plaintiff-Appellee,

v.

Maurice Pierre ROUSTIO, Defendant-Appellant.

No. 71-1335.

United States Court of Appeals, Seventh Circuit.

Jan. 20, 1972.

Rehearing Denied Feb. 8, 1972.

Robert E. Wagner, Chicago, Ill., Robert E. Browne, Walsh, Case & Coale, Associated, Chicago, Ill., of counsel, for defendant-appellant.

Henry A. Schwarz, U. S. Atty., Jeffrey F. Arbetman, Asst. U. S. Atty., E. St. Louis, Ill., Ronald A. Lebowitz, Asst. U. S. Atty., for appellee.

Before DUFFY and HASTINGS, Senior Circuit Judges, and SPRECHER, Circuit Judge.

HASTINGS, Senior Circuit Judge.

Defendant Maurice Pierre Roustio was charged in a one count indictment with robbing the Lincoln Trail State Bank, in Fairview Heights, Illinois, on August 26, 1969, while armed with a dangerous weapon, a gun, in violation of Title 18, U.S.C.A. § 2113(a) and (d).[1] Following a trial by jury on February 1, 1971, a verdict of guilty was returned. Prior to the verdict, defendant's motions for judgment of acquittal at the close of the Government's case and again at the close of all the evidence were denied. After denial of defendant's subsequent

---

1. "§ 2113. Bank robbery and incidental crimes

    (a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, or any savings and loan association;

    \*    \*    \*    \*    \*

    Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

    \*    \*    \*    \*    \*

    (d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or *puts in jeopardy the life of any person by the use of a dangerous weapon* or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both." (Emphasis added.)

motion for a new trial, judgment of conviction on the jury verdict was entered. Defendant was sentenced to imprisonment for a term of fifteen years, the sentence "to run consecutively to the sentence now being served and imposed by the U. S. District Court of Nevada." Defendant appealed. We affirm.

Defendant raises as issues on this appeal several rulings of the trial court which he charges were prejudicial and require reversal. We shall treat such issues after consideration of the evidence in the record as a whole in the light most favorable to the Government, as we are required to do.

Upon our examination of the record evidence, we find that the jury, after weighing the evidence, determining the credibility of the witnesses and drawing reasonable inferences therefrom, had substantial support from which it could have found the following factual narrative to be true.

Shortly after noon on August 26, 1969, Mrs. Mabel Eck, the head teller of the Lincoln Trail State Bank in Fairview Heights, Illinois, was handed a note along with a brown paper bag by a man wearing dark sunglasses, a green T-shirt, white trousers and who had rather dark bushy hair. The note read: "I've got a gun on you. And if you force me I will Kill you. Fill the bag. If you make a sound before I'm out the front door, someone will be shot." Mrs. Eck saw a gun, partly covered with his hand, tucked in the robber's trousers. She filled the paper bag with money and handed it back to the robber who thereupon said, "Thank you", and walked out of the bank. He was seen driving away from the bank in a beige or cream-tan 1962 or 1964 Chevrolet. The rear license plate on the car was covered and the numbers on it were not visible.

Miss Beverly Wilson was working as a bookkeeper in a cage adjoining that of Mrs. Eck when the robbery took place. She saw the man, who later proved to be the robber, standing behind a customer waiting for Mrs. Eck. She also saw a note on the counter and thought it was probably a change order. She saw the robber move to Mrs. Eck's cage window, then saw her flap the brown paper bag and saw the man walk out the front. She then heard Mrs. Eck yell, "Ken, I've been robbed." Miss Wilson ran to the windows to get a description of the car and saw it drive away. She examined the robbery note that had been handed to Mrs. Eck.

Kent Reed was working at his desk as the bank cashier in a corner of the bank lobby where the robbery took place. He saw a man who proved to be the robber first come into the bank lobby about an hour before the robbery and then leave. He saw him come back into the bank lobby about an hour later, wait at the counter and then step to Mrs. Eck's teller window. Reed went ahead with his work. He heard Mrs. Eck call to him that she had been robbed. He saw the robber leave the bank, get into the Chevrolet with its motor running and drive away with a white cloth covering the license plate.

Frank Mattola was the customer who had preceded the robber at Mrs. Eck's teller window. He left the bank before the robbery and was sitting in his car in front of the bank examining his bank book. He saw a man come out of the bank, get into the Chevrolet and drive away at high speed. He saw that the man wore sunglasses and had dark hair.

Defendant's sister-in-law, Wanda Roustio, lived a mile or two from the bank on the day of the robbery. Defendant visited her at her home on the Saturday preceding the day of the bank robbery and again on the same or subsequent day of the robbery. He was wearing a green T-shirt and had bushy auburn hair. He was driving a light color car.

Joseph P. Benson, a special agent for the FBI, received a report of the bank robbery about two o'clock p. m. on the day of the robbery. He went to the bank and began an investigation. Mrs. Eck gave him the robbery note. He

placed it in a cellophane envelope and forwarded it to the FBI Springfield, Illinois office by registered mail to be forwarded to the FBI laboratory in Washington, D.C. He interviewed witnesses at the bank. Other FBI agents were there and participated in the investigation. The robbery note, over objection, was subsequently admitted in evidence at the trial as Government's Exhibit No. 3.

James J. West, a deputy United States marshal, took defendant's fingerprints at his office in East St. Louis, Illinois, the day after the robbery. A photostatic copy of the fingerprint card was admitted in evidence as Government's Exhibit No. 6.

Richard E. Ranells at all times in question was employed by the FBI as a fingerprint examiner at its headquarters in Washington, D.C. He received the robbery note (Exhibit No. 3) in Washington, D.C. on September 22, 1969 and found three latent fingerprints on it.[2] Upon comparison with the fingerprints taken by West (Exhibit No. 6), it was determined that two of such latent fingerprints which had been developed on the robbery note matched two of the inked fingerprints of defendant taken by West. Enlarged photographs of one of the two identifications were admitted in evidence as Government's Exhibit No. 7.

The defendant did not testify in his own defense. He called Agent Benson who testified that on the day after the robbery he went to the office of the St. Louis City Bureau of Vital Statistics in the Municipal Building in St. Louis, Missouri. While there he obtained from a public counter a form for an application for a copy of a birth record. This was similar to the particular paper form on the back of which the robbery note (Exhibit No. 3) was written.

Defendant's other witness was Joseph Thomas, who was returned from Leavenworth Penitentiary where he was serving time for another bank robbery. Thomas testified that defendant was elsewhere than at the scene of the robbery when such robbery was committed.

None of the witnesses could positively identify defendant as the robber. The evidence on identification is necessarily circumstantial.

■ Defendant's basic contention is that there was insufficient evidence to sustain the jury's verdict and resulting conviction. He argues that the Government failed to establish whether the two fingerprints of defendant taken from the robbery note were made before or after the note was written; that there was a failure to establish with certainty that defendant was the robber who handed the robbery note to the bank teller; that the chain of custody of the robbery note was not sufficient to establish the genuineness of the note; and that under "the circumstances and conditions surrounding the note, a case based on fingerprints taken from this note alone is, as a matter of law, not sufficient for a jury to conclude guilt beyond a reasonable doubt." Likewise, defendant further contends that the trial court erred in admitting in evidence Government's Exhibit No. 3, the robbery note.

The law is well settled that a jury verdict must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it. Our review of the evidence, as hereinabove fully set out, leaves us with the clear conviction that the evidence was competent, relevant and substantial enough to support the jury's verdict and defendant's subsequent conviction. United States v. Sangster, 7 Cir., 442 F.2d 1289, 1293 (1971); United States v. Adams, 7 Cir., 403 F.2d 840,

---

**2.** It was shown that a latent fingerprint is a finger impression which has been left by means of perspiration or a foreign substance which has accumulated on the ridges of the fingers. Such fingerprints normally need to be chemically developed before they become visible to the eye. This was done by Mr. Ranells in this case.

842 (1968); United States v. Wilson, 7 Cir., 361 F.2d 134, 135–136 (1966).

■ The fact that defendant's conviction is based in part, at least, on circumstantial evidence, is of no moment to a decision concerning the sufficiency of the evidence. As the Supreme Court stated in Holland v. United States, 348 U.S. 121, at 140, 75 S.Ct. 127, at 137, 99 L.Ed. 150 (1954): "Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more." United States v. Wilson, *supra*, 361 F.2d at 136.

Relying upon Borum v. United States, 127 U.S.App.D.C. 48, 380 F.2d 595 (1967) [3], defendant contends that the fingerprint evidence in the case at bar is not sufficient by itself to support the conviction. *Cf.*, United States v. Scarpellino, 8 Cir., 431 F.2d 475 (1970). We distinguish *Borum* from the case at bar because here there was additional circumstantial evidence from which the jury reasonably could have inferred that defendant was in fact the robber and who therefore was the person who handed Mrs. Eck the note on which defendant's fingerprints were found.

We hold here that defendant's fingerprints had probative value and that it was for the jury to determine, in light of all the other evidence, drawing upon their own common sense and general experience, whether such evidence permitted an inference to be drawn that beyond a reasonable doubt defendant robbed the bank in question. The jury was convinced beyond a reasonable doubt and "we can require no more." *Holland, supra*, 348 U.S. at 140, 75 S.Ct. 127.

It follows, therefore, and we hold that the trial court did not err in submitting the case to the jury or in admitting in evidence Government's Exhibit No. 3, and that there was substantial evidence to support the guilty verdict beyond a reasonable doubt.

■ Defendant was prepared to offer as an alibi witness one George Black. Black had been returned to the district court from the federal penitentiary at Leavenworth, Kansas for this purpose. Prior to calling Black to the stand the trial court had a hearing in chambers, outside the presence and hearing of the jury. There it was shown that while Black was en route from Leavenworth to East St. Louis, Illinois, in custody of a deputy United States marshal, a restroom stop was made at a service station. While there Black and another prisoner attempted to "jump the deputy and take his gun away from him." It was also shown that Black had escaped from San Quentin Penitentiary on August 6, 1969. The chief United States deputy marshal advised the trial court that he thought Black was a dangerous man and that he desired "to bring him into the courtroom with handcuffs." Over objection, the trial court stated "that since the marshal has stated that the man is a potential security risk, the Court would permit the witness Black to be brought in in manacles." Thereupon, defendant's counsel stated he would not call Black and Black was not called to testify.

■ Defendant contends the trial court erred in so ruling and that the denial of the right of Black to testify without manacles as an alibi witness was a denial of due process and the right to a fair hearing. We regard this contention, under the undisputed facts

---

3. *See* Burger, C. J., dissenting at 598. *Cf.*, Stevenson v. United States, 127 U.S.App. D.C. 43, 380 F.2d 590 (1967), cert. denied, 389 U.S. 962, 88 S.Ct. 347, 19 L.Ed.2d 375.

made known to the trial court, to be wholly without merit. Such matters of courtroom decorum rest in the sound discretion of the trial court. Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L. Ed.2d 353 (1970). It is quite clear that, as a general rule under ordinary and normal circumstances, freedom from handcuffs, shackles or manacles during a trial is one of the important components of a fair and impartial trial. Way v. United States, 10 Cir., 285 F.2d 253, 254 (1960). But, by the same token, "it is equally well established that, when the facts warrant, it is within the discretion of the court to require that they [the defendants] be shackled, for the protection of everyone in the courtroom and its vicinity, * * *." Loux v. United States, 9 Cir., 389 F.2d 911, 919 (1969), cert. denied, 393 U.S. 867, 89 S.Ct. 151, 21 L.Ed.2d 135.

Where *Allen, Way* and *Loux, supra,* were concerned with the rights of defendants, the extension of the rule of restraint to a *witness* the defendant proposes to call is equally self-evident. We hold that the trial court here, having conducted a hearing outside the presence and hearing of the jury and having determined in effect that such witness was a dangerous man and a threat to the security of all concerned, did not abuse the discretion vested in him by directing that such prisoner witness be shackled [handcuffed, as proposed by the marshal] when brought into the courtroom to testify.

■ Defendant asserts that the Government exceeded the bounds of propriety in its cross-examination of defendant's prisoner alibi witness Thomas in its impeachment questions about certain criminal offenses with which he had been charged but which did not result in convictions. Defendant contends that such improper impeachment was highly prejudicial and requires reversal. The Government now concedes that such questions were improper. We have carefully read the record covering this phase of the evidence. Without detailing the rather brief record on this, it is apparent that some of the questions were not improper and others were. However, the witness was thoroughly impeached by other evidence, the propriety of which is not questioned, and we conclude that the improper questions asked of this witness were harmless and that there is no reasonable possibility that such evidence complained of might have contributed to defendant's conviction. This is one case where we have no hesitancy in declaring our belief that such error, if any, "was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

■ Finally, defendant asserts that the evidence was insufficient under 18 U.S.C.A. § 2113(d), *supra,* to establish that the life of Mrs. Eck, the teller, was objectively placed in jeopardy. We disagree. The facts hereinbefore set out clearly show that she was afraid at the time of the robbery. The use of the threatening words in the robbery note: "I've got a gun on you, and if you force me I will Kill you. * * * If you make a sound before I'm out the front door, someone will be shot," coupled with her view of the gun tucked in the robber's trousers and her statement that she was afraid, demonstrate beyond doubt that an objective fear for her life was present.

■ The law appears to be well settled that the words used in § 2113(d), *supra,* "puts in jeopardy the life of any person by the use of a dangerous weapon," mean more than a mere holdup with force and fear. The life of the person assaulted must be placed in an objective state of danger. Wagner v. United States, 9 Cir., 264 F.2d 524, 530 (1959), cert. denied, 360 U.S. 936, 79 S. Ct. 1459, 3 L.Ed.2d 1548. However, it is equally well settled that if the gun carried by one in the act of robbing a bank is visible and where its display backs up his demands, this is enough to cause the victim to become intimidated and the fact-finder may fairly infer that such was the case. That was the threat and the assault on the teller here. United

States v. De Palma, 9 Cir., 414 F.2d 394, 396 (1969), cert. denied, 396 U.S. 1046, 90 S.Ct. 697, 24 L.Ed.2d 690; United States v. Marshall, 2 Cir., 427 F.2d 434, 436–437 (1970), and cases therein cited. *Cf.*, Kanton v. United States, 7 Cir., 404 F.2d 606, 607 (1968). Agreeable with the rationale of these authorities, we hold that the display of the gun by the robber, coupled with the reference to the gun and its threatened use, was sufficient evidence from which the jury could reasonably infer and find beyond a reasonable doubt that there was in Mrs. Eck's mind an objective fear for her life.

Finding no prejudicial error, in light of the foregoing, the judgment of conviction is affirmed.

Affirmed.