**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Daniel Jackson TALBERT,
Defendant-Appellant.**

No. 81–1582.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 3, 1982.

Decided July 12, 1983.

Julia Barash, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Richard D. Burda, Los Angeles, Cal., for defendant-appellant.

Before ELY, SCHROEDER, and NORRIS, Circuit Judges.

PER CURIAM:

Talbert appeals from his conviction of first degree murder after a jury trial. Talbert's principal claim on appeal is that the evidence produced against him at trial was insufficient to sustain his conviction. Because we conclude that the evidence was sufficient to support the jury's verdict of guilt, the conviction must be affirmed.

## FACTS

### A. *Background*

On August 4, 1980, the body of Paul Nornes was discovered in an abandoned bowling alley on the grounds of the Brentwood Veterans Administration Psychiatric Hospital in Los Angeles, California. The coroner determined that Nornes had died from severe head injuries apparently inflicted during a beating. On April 21, 1981, Talbert was indicted for the murder of Nornes on a government reservation in violation of 18 U.S.C. § 1111 (1964).[1] After a five-day trial followed by five days of deliberation, the jury returned a verdict of guilty. The district court denied both Talbert's motion for judgment of acquittal made after conclusion of the government's case, and his renewed motion for judgment of acquittal made after return of the verdict. On September 14, 1981, Talbert was sentenced to life imprisonment.

### B. *Relationship of Nornes and Talbert*

Nornes and Talbert were patients at the Brentwood psychiatric facility during overlapping time periods in 1980. Nornes was discharged from the facility on July 17, 1980, Talbert on July 16, 1980.[2] After his

discharge, Nornes continued to reside on the hospital grounds without official consent. Sometime before his death, Nornes took up residence in a bowling ball storage room located inside the abandoned bowling alley building. After his discharge, Talbert continued to regularly frequent the patients' gathering places on hospital grounds.

Nornes supported himself by selling marijuana to the psychiatric patients who resided at the hospital. Talbert was among those known to have dealings with Nornes. While Nornes made no secret of his marijuana transactions and was generally known to have money and marijuana with him, he was secretive about where he lived. Talbert had helped Nornes carry a mattress to the storage room and was therefore one of the few who knew that Nornes lived in the abandoned bowling alley.

One witness testified that he overheard appellant and Nornes plan a "ripoff" of a "marijuana plantation" in the San Bernardino mountains. Another witness testified that he heard appellant say, apparently as a joke, that he would not mind "bumping Nornes on the head to get his marijuana."

One week before Nornes' death, several witnesses observed his taking $650 from his money belt and giving it to Talbert; Talbert was to use the money to make a marijuana purchase for Nornes. On Friday, August 1, Talbert was seen on the grounds looking for Nornes. He told two witnesses that he was looking for Nornes to pay back the money he had stolen from him (presumably the $650). Talbert reportedly said, "I am going to pay him back as soon as I get my hands on him."

### C. *The Murder Scenario*

Nornes' body was discovered in the bowling ball room by a hospital employee at

---

1. This section provides, *inter alia:*
   (a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; · or perpetrated from a premeditated design unlawfully and maliciously to effect

the death of any human being other than him who is killed, is murder in the first degree. Any other murder is murder in the second degree.

2. Nornes had entered the psychiatric facility as an in-patient on March 3, 1980. He previously had been admitted for two months commencing August 29, 1979. Talbert had entered the facility on March 16, 1980.

approximately 3:00 p.m. on Monday, August 4th. Nornes was found face down on the floor, his feet and legs resting on a mattress, his body clad only in a tee shirt. Nornes' money belt lay open and empty on the mattress. A bowling pin stood on the floor three feet from the body. Expert testimony revealed that the pin was the kind of instrument that caused Nornes' fatal head injuries. Blood stains found on the pin were identified as being of the same type as Nornes' blood. Further, Talbert's right thumbprint was discovered on the neck of the bowling pin, positioned so as to have enabled him to grip the pin by its throat and turn it upside down as a club. No other bowling pins were found in the storage room, although similar pins were discovered seventy-five feet away in the adjacent bowling alley portion of the building.

The coroner testified that Nornes died sometime during the twenty-four hour period beginning at 6:30 a.m. on Sunday, August 3rd, and ending at 6:30 a.m. on Monday, August 4th. Talbert offered alibi evidence that he was out of town during part of this time. Rebuttal evidence established that Talbert's timetable left approximately two to four hours unaccounted for on the day of August 3rd during which Talbert was probably in the Los Angeles area and could have come to the Brentwood vicinity. The evidence also showed that Talbert was concerned about money.

## ANALYSIS

A defendant is entitled to a judgment of acquittal if the evidence produced against him is insufficient to sustain a conviction. Fed.R.Crim.P. 29(a). We review the evidence produced against Talbert in the light most favorable to the government to determine whether substantial relevant evidence was produced from which the jury could reasonably have found Talbert guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *United States v. Miller,* 688 F.2d 652, 663 (9th Cir.1982). Circumstantial evidence is suffi-

cient to sustain a conviction, and the government's evidence need not exclude every reasonable hypothesis consistent with innocence. *Miller, supra,* 688 F.2d at 663, *citing United States v. Federico,* 658 F.2d 1337, 1343 (9th Cir.1981).

The appellant argues that the circumstantial evidence produced against him does not permit a rational inference of guilt. He seeks to characterize this case as one in which the only evidence supporting the jury's verdict is the thumbprint on the murder weapon.

The defendant's thumbprint on what was almost certainly the murder weapon is, of course, highly incriminating. This court has held that fingerprint evidence, if sufficiently probative, may by itself support a conviction. *See United States v. Crenshaw,* 698 F.2d 1060, 1064 (9th Cir.1983); *United States v. Scott,* 452 F.2d 660, 662 (9th Cir. 1971). Appellant argues, however, that the fingerprint evidence is not sufficient in this case because the government did not prove that the imprint could only have been made at the time of the crime. Appellant was one of the few who knew where Nornes lived, and he had access to the room. The thumbprint might have been placed on the bowling pin, appellant suggests, when he helped Nornes move his mattress into the bowling ball storage room, or at some other time prior to the murder. Appellant relies on cases such as *Borum v. United States,* 380 F.2d 595 (D.C.Cir.1967) and *People v. Donahue,* 50 Ill.App.3d 392, 8 Ill.Dec. 472, 365 N.E.2d 710 (1977), in which courts have held that fingerprint evidence at the scene of the crime will not alone support a conviction if there is a reasonable possibility that the prints could have been placed there innocently.

The difficulty with appellant's position, however, is that the evidence here indicates that it was extremely unlikely that appellant had innocently touched the bowling pin at an earlier time. Although there were over one hundred bowling pins in the building, they were not stored in or near the storage room where Nornes slept. Instead, they were stored seventy-five feet away in

a separate area of the building. Witnesses who examined the other bowling pins after Nornes' death testified that they were dirty and dusty and appeared undisturbed. Further, there was no evidence that Nornes kept a pin in his room. One witness testified that on August 2, the day before Nornes' death, he was looking for Nornes to buy some marijuana. He peered into Nornes' room through a window and saw neither Nornes nor the bowling pin.

From the evidence, the jury reasonably could have concluded that there was never a bowling pin in Nornes' room until the time of the murder. It is theoretically possible that at some time prior to the murder, appellant wandered near the bowling pins, seventy-five feet from Nornes' room, and by coincidence innocently touched the one pin out of the hundred that the murderer would later pick up and use as his murder weapon. That theoretical possibility, however, could have been rejected by a reasonable jury as too remote.

Furthermore, this is not a "fingerprints only" case. Appellant knew the victim and the jury reasonably could have concluded that the two men had a history of drug transactions. Appellant knew that Nornes kept large sums of money in his money belt. The jury heard testimony concerning appellant's "joke" that he would not mind "bumping Nornes on the head" as well as his ambiguous remark later that he would "pay Nornes back when [he] got [his] hands on him." Finally, appellant's alibi defense failed to account for a two-to-four hour period in the late afternoon and evening of August 3, when he was almost certainly in Los Angeles and could have gone to the hospital grounds and killed Nornes.

Thus, this case is wholly unlike those cases in which only fingerprint evidence links a defendant to the crime. For example, in *Borum, supra,* upon which appellant heavily relies, the only evidence supporting the defendant's conviction for housebreaking was testimony that his fingerprints were found on the glass jars from which the

victim's coin collection was stolen. The D.C. Circuit reversed, because an expert had testified that the prints could have been two years old and because there was no evidence to support the inference that the prints were left during the commission of the crime. As other circuit courts have stated, the holding in *Borum* and its progeny only is applicable in situations where there is no additional circumstantial evidence linking the defendant to the crime. *See United States v. Harris,* 530 F.2d 576, 579 (4th Cir.1976); *United States v. Roustio,* 455 F.2d 366, 370 (7th Cir.1972); *United States v. Scarpellino,* 431 F.2d 475, 478 (8th Cir.1970). We therefore conclude that the district court properly denied the defendant's motion for judgment of acquittal at the conclusion of all evidence.

We also conclude that the evidence was sufficient to support the jury's finding of premeditation and that the district court therefore properly denied the defendant's motion for judgment of acquittal made after return of the verdict. If the jury determined that the killer picked up the murder weapon and carried it back seventy-five feet to Nornes' room, its finding of premeditation was justified. *See Hemphill v. United States,* 402 F.2d 187, 189–91 (D.C.Cir. 1968) (time to walk up stairs consistent with finding that killing was product of deliberation, when motive was shown).

Affirmed.

ELY, Circuit Judge, dissenting:

I respectfully dissent.

I am convinced that no rational trier of fact could have found Talbert guilty beyond a reasonable doubt on the evidence adduced at his trial. The only significant evidence produced against Talbert was his thumbprint on the bowling pin. The principle is universally established, however, that convictions obtained through fingerprint evidence will be upheld only if the Government produced either evidence that the print could have been impressed only during the commission of the offense,[1] or separate

---

1. *See, e.g., United States v. Lonsdale,* 577 F.2d 923, 924–25 (5th Cir.1978); *United States v.*

*Corso,* 439 F.2d 956, 957 (4th Cir.1971); *United States v. Collon,* 426 F.2d 939, 941 (6th Cir.

evidence of guilt.[2] Contrary to the majority's assertions, neither of these corroborative circumstances are apparent in the record before us.

First, the Government failed to establish that Talbert's print was impressed during the commission of the crime. There was no evidence tending to show that Talbert lacked prior access to the bowling pin. Compare *Borum*, 380 F.2d at 597, *with Stevenson v. United States*, 380 F.2d 590, 594 (D.C.Cir.1967). To the contrary, there was undisputed evidence that Talbert had prior access. Moreover, there was no affirmative evidence tending to show that Talbert actually touched the pin at the time of the offense: The Government failed to place Talbert at or near the veterans' facility during the relevant time period. Rather,

the evidence tended to place Talbert at a Los Angeles bus station approximately twenty miles from the hospital.

The fingerprint expert who testified at Talbert's trial was unable to lend support to the speculative inference that Talbert grasped the pin at the time of the murder. The expert could not determine how long Talbert's print had been implanted on the pin. The expert also asserted that a second print, placed on top of Talbert's, would not have obscured Talbert's print and that it was possible to touch the pin without leaving a print at all. Although the expert detected no latent prints over Talbert's, neither did he detect identifiable prints on Nornes' personal effects.

Finally, the apparent unlikelihood of both Talbert and the killer grasping the same pin

---

1970). *See generally* Annot. 28 A.L.R. 140–52 (Later Case Service 1981).

**2.** *See, e.g., United States v. Durham*, 512 F.2d 1281, 1289 (5th Cir.), *cert. denied*, 425 U.S. 871, 96 S.Ct. 137, 46 L.Ed.2d 102 (1975); *United States v. Roustio*, 455 F.2d 366, 370 (7th Cir. 1972); *United States v. Scarpellino*, 431 F.2d 475, 478 (8th Cir.1970). *See generally* Annot., 28 A.L.R. 140–52 (Later Case Service 1981).

The majority misleadingly states that "[t]his court has held that fingerprint evidence, if sufficiently probative, may by itself support a conviction," citing *United States v. Crenshaw*, 698 F.2d 1060 (9th Cir.1983), and *United States v. Scott*, 452 F.2d 660 (9th Cir.1971). These are the only two cases in which this court has previously addressed the adequacy of fingerprint evidence to sustain a conviction. In each case, there was both separate evidence of guilt and evidence that the prints had been impressed during the commission of the crime. *Crenshaw*, 698 F.2d at 1064; *Scott*, 452 F.2d at 662. Perhaps in using the qualification "if sufficiently probative," the majority intends to preserve the universally established rule requiring corroboration of fingerprint evidence. Nevertheless, the majority's language is ambiguous and may be subject to erroneous application in future cases. I wish, therefore, to set the record straight: In no prior case has this court held that fingerprint evidence, standing alone, may be sufficient to sustain a conviction.

In *Crenshaw*, three co-defendants appealed robbery convictions. One of the defendants, Gordon, argued that the District Court erred in admitting certain identification evidence against him and that some of the prosecutor's statements made at trial were prejudicial to him. The evidence produced against Gordon at

trial was substantial: (1) He left three fingerprints, known to have been left by one of the robbers, at the scene; (2) two bank employees, each twice, selected his picture from a photo line-up; (3) he carried a concealed weapon matching the description of one of the weapons used in the robbery; and (4) he occupied a hotel room with the other two robbers after the theft. Although this court found no error in connection with Gordon's prosecution, the opinion erroneously and unnecessarily adds that "[t]his court has held that fingerprint evidence alone is sufficient to convict," 698 F.2d at 1064, citing *Scott*.

In *Scott*, the defendant was convicted of theft from a federal savings and loan association. The evidence produced against him at trial consisted of his fingerprint on a packet of checks identified as having been stolen on the relevant night, and his fingerprints found on a battery inside a flashlight left at the scene of the crime. This court affirmed the defendant's conviction. In so doing, this court distinguished the "fingerprint only" cases on the grounds that

*[h]ere, the flashlight was identified as having been left at the Association during the crime.* The identification of the defendant's fingerprints upon one battery inside the flashlight might well have been insufficient circumstantial evidence to survive a motion for acquittal. But when that evidence is combined with positive fingerprint evidence upon the Association's stolen check and its stolen traveler's checks, the ring of circumstantial evidence tightens around the defendant. 452 F.2d at 662 (emphasis added).

Clearly, neither *Crenshaw* nor *Scott* held that fingerprint evidence, standing alone, may be sufficient to convict. Any contrary language in either opinion is pure dictum.

fails to supply the necessary corroboration to establish that Talbert touched the pin at the time of the murder. The only inquiry required by either precedent or logic is whether Talbert *could have* touched the bowling pin on a prior occasion. *Hiet v. United States,* 365 F.2d 504, 505 (D.C.Cir. 1966). The likelihood of the killer grasping the same pin is a matter of statistical probability and we simply do not possess sufficient information on the basis of the record before us to evaluate the odds. Perhaps the bowling pin in question lay apart from the others, perhaps it obstructed a pathway. The likelihood of the killer touching the same pin would be much greater if Talbert had previously touched many of the pins. Yet, the record is clear that only a few of the pins were tested for prints, although the pins laying in the gutters had little or no dust on them.[3] Moreover, the pin may already have been in Nornes' room when Talbert or the killer touched it. The witness who testified at trial that he did not see a bowling pin in Nornes' room the day before the murder also did not see any bowling balls in the room. Nornes' room was used, however, to store bowling balls and it contained several racks of balls when the witness peered through the window. Logic demands that we abstain from reliance on unestablished, unsupported, statistical "evidence" when reviewing the strength of the Government's case.

Second, the Government failed to establish separate evidence of guilt to corroborate the defective fingerprint evidence. The majority disagrees, citing Talbert's marijuana transactions with Nornes, Talbert's knowledge that Nornes carried large sums of money with him, Talbert's presence in Los Angeles during the time period in which Nornes was killed, Talbert's "threatening" comments, and the fact that Talbert's thumbprint was on the neck of the bowling pin. Upon scrutiny, the weakness of this so called corroborative evidence is appalling.

Nothing in Talbert's and Nornes' relationship suggested a murderous inclination on Talbert's part. The only conceivable significance of their marijuana transactions was that from Nornes' public transfer of cash to Talbert for the purchase of marijuana, accomplished in the presence of approximately sixteen psychiatric patients, Talbert and others learned that Nornes carried large sums of money with him in his money belt. Yet, there was no evidence that Talbert had any particular need for money.[4] During Talbert's two-day visit to Santa Barbara, beginning on Saturday, August 2nd, he paid cash in advance for a motel room with a one hundred dollar bill. On a previous trip to Santa Barbara, beginning on July 28th, it appeared to the motel manager that Talbert was carrying "a couple of hundred dollars" with him. On Talbert's August 2nd visit, the manager offered Talbert a job which Talbert declined explaining that he was expecting a disability check soon. Finally, Talbert had been looking for Nornes on August 1st to repay the approximately $650 that he had taken from Nornes to make a marijuana purchase that was never completed.

The majority's reliance on the fact that Talbert was in Los Angeles during a portion of the time period in which Nornes was killed is difficult to comprehend. That Talbert was in Los Angeles and, therefore, may have had an opportunity to kill Nornes lends no support to the conclusion that Talbert actually committed the act of killing Nornes. *United States v. Hoke,* 610 F.2d 678, 679 (9th Cir.1980) (A defendant's failure to establish an alibi does not constitute evidence of guilt). In fact, the evidence concerning Talbert's whereabouts on Sun-

---

**3.** The majority cites testimony that the bowling pins were dusty. The witness actually testified, more specifically, that the numerous pins in the gutters were essentially free of dust while the pins in the racks were dusty and appeared undisturbed.

**4.** The majority's statement that Talbert had a particular need for money is virtually unfounded. The only basis in the record for this assertion is from the fact that he telephoned his parents asking whether his disability check had arrived. The supposition that Talbert had a special need for money is clearly outweighed by evidence to the contrary.

day, August 3rd, is more exculpatory than neutral. In order for Talbert to have killed Nornes, Talbert would have had to travel from a downtown Los Angeles bus station twenty miles to the veterans' hospital and then return to the bus station within approximately three hours. In so doing, however, Talbert would have had no assurance that he would find Nornes if he made the trip. Nornes was a vagrant of whose immediate whereabouts Talbert could have no advance knowledge.

Talbert's so called "threatening" comments, viewed in the contexts in which they were spoken, fail to evince the hostile intent with which the majority seeks to infuse them. Talbert's intentions when he stated that he wanted to return Nornes' money "as soon as [he] could get [his] hands on him" were obviously benign. Although a jury may draw reasonable inferences from the facts presented, I find it inconceivable that a jury could reasonably draw an inference that Talbert intended a threat with this language. Talbert's stated purpose in looking for Nornes was completely innocent and his colloquial wording extremely commonplace. Moreover, Talbert's statement that he wouldn't mind bumping Nornes on the head for his marijuana, uttered approximately one month before Nornes was killed, was made facetiously in the context of a friendly discussion about going downtown, "getting high" and seeing a movie. Talbert's words, spoken in jest, are hardly sinister enough to corroborate the otherwise inadequate evidence of Talbert's culpability.

Finally, the fact that Talbert's thumbprint was found on the neck of the bowling pin is virtually irrelevant: For nearly any conceivable purpose, the neck of a bowling pin is the obvious place by which to grasp and move it.

In view of the unconscionable weakness of the Government's case against Talbert, I think it indisputable that the jury inferred that Talbert committed the act of killing Nornes from the circumstantial evidence of Talbert's thumbprint on the bowling pin. This court has held that "[w]hile inferences from facts that have been established by circumstantial evidence may be sufficient to sustain a verdict of guilt, mere suspicion or speculation cannot be the basis for the creation of logical inferences." *United States v. Thomas,* 453 F.2d 141, 143 (9th Cir.1971), *cert. denied,* 405 U.S. 1041, 92 S.Ct. 1312, 31 L.Ed.2d 581 (1972). In order to infer from the thumbprint that Talbert killed Nornes, the jury must also have concluded that Talbert placed his thumbprint on the bowling pin during the commission of the offense. This conclusion lacks foundation in any direct or circumstantial evidence produced at trial and must, therefore, be based on mere speculation.

The logic of the *Borum* opinion, in rejecting a conviction based on such an unsupported inference, is sound. Prior to the majority's opinion in the case before us, no federal court has rendered a decision inconsistent with *Borum.*[5] In *Borum,* a reasonable doubt as to the defendant's guilt rested on the hypothesis that sometime, somewhere, the defendant touched the jars that contained or that were to contain the victim's private coin collection. There was no evidence in *Borum* that the victim knew the defendant or had ever invited the defendant into his home. In contrast, the record below establishes that Talbert had been invited into Nornes' shelter and might innocently have touched any of the objects therein.

To sustain Talbert's conviction is to adopt the outrageous and unprecedented position that someone may be convicted of a crime simply because his fingerprint was found at the scene, and despite evidence that he could have impressed the fingerprint at a time other than during the commission of the crime. This outcome exposes the innocent to a tremendous threat of false accusation. Fingerprint evidence ought not be subject to the intolerable abuses possible, and actual, under the majority's view. I am hopeful that, as precedent, the majori-

---

**5.** My research disclosed that only the jurisdiction of Kentucky has adopted a contrary rule.

*Mason v. Commonwealth,* 357 S.W.2d 667, 668 (Ky.1962).

ty's opinion will be confined to the facts of this case and will not be used in abuse of the logical weight to be accorded fingerprint evidence in future cases.