967 F.2d 593
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Stevie A. GRAY, Defendant-Appellant.
 No. 90-10598.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 11, 1991.
Decided June 30, 1992.
 
 Before WILLIAM A. NORRIS, BEEZER and LEAVY, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Stevie Gray appeals his conviction for murdering his wife by pushing her off a cliff in Yosemite National Park. We affirm.
 
 
 3
 * Gray's wife died from a fall off a 350-foot cliff in Yosemite Park near Discovery View less than four months after she married him. Gray initially told rangers he had taken a short nap and found that his wife was gone when he woke up. A team of forest rangers found her body at the foot of the cliff the next morning. There were no witnesses to the fall itself.
 
 
 4
 The government argued at trial that Gray killed his wife for insurance money after he had enticed her into a loveless, sham marriage. Gray purchased two insurance policies on his wife's life. Nine days before his marriage, he purchased the maximum amount of insurance available on his wife, an IRS clerk, through the Uniformed Services Benefit Association. Gray also took out insurance on his own life, which had a secondary benefit that paid $145,000 upon the death of his wife. Both policies paid a $32,000 benefit for accidental death. Less than 24 hours after the discovery of his wife's body, Gray began efforts to collect the approximately $500,000 in insurance proceeds.
 
 
 5
 Gray admits that, before marrying her, he lied to his wife about his accomplishments. He falsely told her that "he was a flight engineer involved with an aircrew, his dad was wealthy, he had maids, and his mother was a business executive." Appellant's Opening Brief 22. Gray saw other women during their courtship and marriage. Gray called another woman on the night of his marriage and, shortly before his wife's death, he proposed to another woman.
 
 
 6
 Gray also admits that he gave several different versions of the events on the day of his wife's death. In his initial call reporting her as "missing," he stated that he had fallen asleep and awakened to find her gone. He gave the same account to a ranger who met with him in response to the call and to a second ranger who spoke to him that night. Later that month, Gray told another ranger a similar version of events. When asked about insurance, Gray responded that insurance would barely cover the costs of a funeral.
 
 
 7
 Gray told a somewhat different story in an interview by an FBI agent several weeks later. He admitted applying for insurance, but denied receiving any confirmation and denied contacting the insurer after her death. After further questioning, Gray changed his story and admitted hearing his wife scream. He claimed that they had been discussing her relationship with her mother and that she had gone off to relieve herself shortly before he heard her screams. The next month, in a meeting with an FBI agent to provide fingerprints and samples of his handwriting, Gray volunteered that he knew about insurance policies on his wife's life.
 
 
 8
 Gray testified at trial. He again stated that his wife had left to relieve herself shortly before he heard her screams. In his trial testimony, however, he stated that they had been discussing not her relationship with her mother, but his affairs with other women.
 
 
 9
 At trial, Gray's counsel emphasized that the government's case rested entirely on circumstantial evidence and lacked any physical evidence that was inconsistent with an accidental death. In an effort to explain Gray's lies, his counsel argued that he came from a poor background and suffered discrimination by his wife's family because he was black, and they were not.
 
 
 10
 A jury convicted Gray of murder, and the district court sentenced him to life in prison.
 
 II
 
 11
 Gray argues that there was insufficient evidence to support his conviction. We review the sufficiency of evidence to determine whether, viewing the evidence in the light most favorable to the conviction, " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Gillock, 886 F.2d 220, 221-22 (9th Cir.1989) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis deleted by Gillock ). In conducting this review, we " 'must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict.' " Id. at 222 (quoting United States v. Ramos, 558 F.2d 545, 546 (9th Cir.1977)). Gray makes two arguments with regard to the sufficiency of the evidence.
 
 
 12
 First, Gray argues that the evidence "merely demonstrated four ultimate facts.... Gray is a habitual liar who was not sexually faithful to his wife. He purchased a large [life] insurance policy on her life and was in the general vicinity when she fell to her death from a 350 foot cliff." Appellant's Opening Brief 24. Gray acknowledges that circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction. See United States v. Talbert, 710 F.2d 528, 530 (9th Cir.1983), cert. denied, 464 U.S. 1052 (1984). Gray relies on United States v. Lewis, 787 F.2d 1318, 1323, amended at 798 F.2d 1250 (9th Cir.1986), appeal after remand, 862 F.2d 748, cert. denied, 464 U.S. 1052 (1989), and United States v. Thomas, 453 F.2d 141, 143 (9th Cir.1971), cert. denied, 405 U.S. 1069 (1972), however, for the proposition that "mere suspicion or speculation cannot be the basis for the creation of logical inferences." Id. Thomas held that "mere presence or proximity to contraband in an automobile, without more, is insufficient to establish the guilt of a passenger for transporting." 453 F.2d at 143.[1]
 
 
 13
 The government argues that it does not rely solely on Gray's proximity to his wife's fatal fall. The government argues that the combination of evidence--Gray's lies to his wife during courtship, his involvement with other women before and during their marriage, his procurement of two distinct life insurance policies with a combined benefit of several hundred thousand dollars, and Gray's shifting accounts of his wife's death--support the logical inference that Gray planned to kill her for insurance money. Because the government does not rely on mere proximity to the site of his wife's death to support his conviction, we agree with the government that Gray's reliance on Lewis and Thomas is misplaced.
 
 
 14
 Second, Gray emphasizes that there is no physical evidence that is inconsistent with his trial testimony that his wife must have died from an accidental fall while attempting to relieve herself. His wife was found with her jacket off, her shirt hiked up, and her pants pulled down. There was, he argues, no physical evidence of a struggle at the cliff.
 
 
 15
 The government, however, replies that there is no physical evidence that is inconsistent with her murder. The government argued to the jury that the fall itself might have caused his wife's clothing to come off. In the alternative, the jury might have concluded that his wife did attempt to relieve herself at the edge of the cliff, but that Gray pushed her at a moment of extreme vulnerability. Either of these explanations would support the verdict. There was also evidence to explain the absence of footprints at the site of his wife's fall.[2] Accordingly, the absence of physical evidence that is consistent only with guilt is not fatal to the government's case.[3]
 
 
 16
 In sum, we agree with the government that there was sufficient evidence from which a reasonable jury could have inferred that Gray lured his wife into a sham marriage for the purpose of killing her and collecting insurance money.
 
 III
 
 17
 Gray next argues that the prosecutor impermissibly elicited testimony that he asserted his constitutional right to counsel and to cease questioning. See United States v. Wycoff, 545 F.2d 679, 681-82 (9th Cir.1976) (citing Doyle v. Ohio, 426 U.S. 610 (1976)), cert. denied, 429 U.S. 1105 (1977).[4] During the prosecutor's direct examination of the agent that interviewed Gray, the agent related that he asked Gray if he killed his wife. The prosecutor then continued as follows:
 
 
 18
 Q. And what did he say?
 
 
 19
 A. He stood up and said, "I can't believe you guys. You don't have anything on me."
 
 
 20
 Q. Were those his words?
 
 
 21
 A. Those are his words. "If you have something on me, arrest me." He turned around and he motioned with his hands behind his back, as to infer that we should arrest him. He then asked for an attorney.
 
 
 22
 Reporter's Transcript (RT) 788 (emphasis supplied).
 
 
 23
 Gray's counsel immediately objected that the testimony revealed the fact that Gray requested an attorney and exercised his right to cease questioning. Gray's counsel moved for a mistrial, and the court denied the motion. Gray's counsel repeated that it was grounds for a mistrial to allow testimony that Gray requested an attorney. The prosecutor then stated, "We will request you to give a cautionary instruction if that's a problem." RT 789. The district court denied the motion and did not give a cautionary instruction.
 
 
 24
 We need not address the government's argument that the agent's testimony was too brief to constitute constitutional error, see Lingdren v. Lane, 925 F.2d 198, 202-03 (7th Cir.), cert. denied, 112 S.Ct. 105 (1991), because we agree that any error was harmless beyond a reasonable doubt. "When deciding whether the prosecutor's conduct was harmless, we will consider the extent of comments made by the witness, whether an inference of guilt from silence was stressed to the jury, and the extent of other evidence suggesting defendant's guilt." United States v. Newman, 943 F.2d 1155, 1158 (9th Cir.1991). In this case, Gray objected below to a single comment that disclosed he requested an attorney and invoked his right to cease questioning. There is no claim that the prosecutor thereafter mentioned the request for counsel.
 
 
 25
 Gray argues for the first time on appeal that the revelation that he invoked his right to cease questioning provided a "foundation ... for subsequent, more subtle attacks." Greer v. Miller, 483 U.S. 756, 773 (1987) (Brennan, J., dissenting). Gray argues the prosecution erred because it implicitly invited the jury to penalize him for the fact that, subsequent to invoking his right to cease questioning, he did not admit knowledge of insurance until his fingerprints and handwriting sample were taken. The prosecutor asked Gray, "But you never set the record straight on the insurance....," and Gray answered he had not. RT 2155. In closing, the prosecutor stated that "the only time he told the truth was when he was giving fingerprints and giving handwriting...." RT, Closing Argument at 130.[5] Thus, Gray argues that these "subtle attacks" add to the extent of comments regarding exercise of his constitutional rights and the extent of their stress to the jury.
 
 
 26
 There is only a very narrow sense in which such "subtle attacks" might be error. It is uncontested that Gray did not disclose the extent of insurance in several extensive interviews prior to invoking his right to silence, although there was evidence that Gray was asked whether he had told everything. RT 2155. It would not have been error to state, or argue, that prior to invoking his right to silence, Gray failed to disclose the extent of insurance. By phrasing his argument in terms of Gray's failure to disclose such information prior to the taking of fingerprints and handwriting samples, however, the prosecutor arguably invited the jury to infer guilt from the fact that Gray did not disclose the truth about the insurance during the time between his invocation of his right to cease questioning and his subsequent admission about the insurance. It is only this narrow implication that may have been error.[6] For the purposes of considering whether testimony disclosing Gray's exercise of his constitutional rights was harmless error, we think this narrow implication adds little to the extent of comments on Gray's exercise of his constitutional rights.[7] Because the jury could have considered the far weightier evidence that Gray failed to disclose the extent of insurance during several interviews prior to his ceasing questioning, it is difficult to comprehend how consideration of the fact that Gray did not make such a disclosure between the time he ceased questioning and the time he volunteered the disclosure could have affected the jury's verdict.
 
 
 27
 The narrow implication was also, at the very most, a marginal part of the prosecutor's closing argument. As we explained above, there was no error to the extent that the prosecutor's comments stressed Gray's failure to reveal, during several extensive interviews, the approximately half a million dollars he stood to gain from his wife's death. The prosecutor's closing reminded the jury of much other evidence: Gray did not initially lead investigators to the trail down which his wife had gone; he did not use a phone near Discovery Point to contact authorities, but drove several miles to the floor of Yosemite; he claimed that he took out insurance to protect his wife in case he was hurt in the Persian Gulf, but he took out more insurance on her; he told his wife lies prior to their marriage; he mourned little after her death.
 
 
 28
 Finally, in assessing "other evidence suggesting" Gray's guilt, see Newman, 943 F.2d at 1158, we also note that Gray took out insurance prior to his marriage and began attempts to collect on the policies within one day of discovery of his wife's body. Accordingly, in light of the strong circumstantial evidence of guilt and the limited extent of any improper evidence or argument, we hold that any error associated with Gray's exercise of his constitutional rights was harmless beyond a reasonable doubt.[8]
 
 
 29
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Lewis held that the evidence was sufficient to sustain a conviction for conspiracy. 787 F.2d at 1324
 
 
 [2]
 One witness testified that it was difficult to obtain footprints in the area because the ground was rocky. Although there was a search party in the area the night of the disappearance, investigators could not find any footprints--not even their own--the next morning
 
 
 [3]
 Gray also argues that the cases on which the government relies are distinguishable on their facts because they included some physical evidence that was consistent only with guilt or that was inconsistent with the defendant's account of events. See United States v. Kennedy, 714 F.2d 968, 971-73 (9th Cir.1983) (cumulative circumstantial physical evidence was sufficient to support a conviction for rape and felony murder), cert. denied, 465 U.S. 1034 (1984); Rothgeb v. United States, 789 F.2d 647, 648-50 (8th Cir.1986) (defendant's account of events surrounding his wife's death impeached by physical evidence). Kennedy and Rothgeb merely hold that the evidence in those cases, including physical evidence, was sufficient to sustain the conviction; they do not hold that a murder conviction necessarily requires physical evidence
 
 
 [4]
 Gray was warned that he could cease questioning at any time, and that due process therefore forbade the prosecutor from suggesting the jury could infer guilt from Gray's exercise of that right. See Doyle v. Ohio, 426 U.S. at 618-19 & n. 9 ("elementary fairness" requires that a defendant not be penalized for having exercised a right after government assurances that he would not be penalized for exercising such a right)
 
 
 [5]
 Gray did not object to such questions or to the prosecutor's closing
 
 
 [6]
 It is difficult to comprehend how Gray would have preferred the prosecutor to handle the evidence. The prosecutor might have said, "Prior to invoking his right to silence, in several extensive interviews, Gray failed to disclose the fact that he stood to gain nearly half a million dollars in insurance despite the fact that he was asked if he had told the whole truth." Such a statement would have avoided the implication that Gray should have disclosed the information prior to questioning, but would have emphasized that Gray did, in fact, cease questioning
 
 
 [7]
 Insofar as Gray argues that this narrow implication in closing argument is alone reversible error, despite his failure to object, we have no difficulty concluding that the district court did not commit plain error. See Mitchell v. Goldsmith, 878 F.2d 319, 324 (9th Cir.1989)
 
 
 [8]
 Finally, Gray argues that several jury instructions, individually and collectively, were improper. We conclude that the instructions were not defective