**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kory C. SMITH, Defendant–Appellant.**

**No. 96–1313.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 25, 1996.

Decided Dec. 27, 1996.

John W. Vaudreuil (argued), Office of the United States Attorney, Madison, WI, for Plaintiff–Appellee.

Daniel W. Hildebrand (argued), DeWitt, Ross & Stevens, Madison, WI, for Defendant–Appellant.

Before WOOD, Jr., EASTERBROOK, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

On November 28, 1995, Kory Smith was convicted by a jury of armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d). The District Court sentenced Smith to 14 years in prison and ordered him to pay restitution to the victim banks. On appeal, Smith raises four issues: 1) that the trial court should not have admitted evidence of a prior bank robbery by Smith as proof of his identity in this case; 2) that the trial court gave erroneous jury instructions regarding 18 U.S.C. § 2113(d); 3) that the evidence was insufficient to convict him of armed bank robbery; and 4) that the trial court should not have enhanced his sentence for obstruction of justice. We reject all but the second of Smith's contentions, and because any error in the jury instructions was harmless, we affirm both the conviction and the sentence.

## I. History

Kory Smith was indicted for two armed bank robberies—the first one on July 11, 1994 in Wheeler, Wisconsin and the second one a month later on August 19, 1994 in Holcombe, Wisconsin. Smith pleaded guilty to the Wheeler robbery and went to trial on only the Holcombe robbery charge. The facts of both robberies are relevant, however, because evidence of the Wheeler robbery was offered at trial to show Smith's identity in the Holcombe heist.

Wheeler is a small town in northwest Wisconsin with a population of about 200. On July 11, 1994, a friend who had agreed to help Smith rob a bank drove Smith to a branch bank in Wheeler and dropped him off at 6:30 a.m. The friend parked the car in a wooded area 200 yards from the bank while waiting for Smith. Smith returned promptly, however, telling the friend that the bank would not open for another hour and a half. The friend left but returned to the bank sometime before 8:00 a.m. Smith appeared shortly thereafter and hopped in the friend's car with the approximately $5,000 he had stolen. Smith subsequently gave some of the take to another friend who used it to purchase a white, 1987 Pontiac 6000.

At trial, the lone teller at the Wheeler branch bank testified that a thin white male, approximately 6 feet tall and in his early twenties, had entered the bank wearing a ski

mask, brown leather gloves, and a light tan jacket. She testified that the man held a 12–15 inch knife pointing up in the air. The robber, who of course was Smith, asked the teller where the vault was and proceeded to follow the teller around the counter to the back room, bypassing an open teller drawer that contained money. Smith ordered the teller into the bathroom and then took his loot from the safe.

From August 11 through August 16, Smith travelled in the white Pontiac to New York and back, along with the friend who had driven him to the bank, the friend who had purchased the car, and a third acquaintance. Towards the end of the trip, Smith ran out of money and unsuccessfully called home to try to get his mother to wire him some cash. Smith also spoke during August to his Wheeler getaway driver about robbing a bank in Holcombe, Wisconsin.

Holcombe is another small town approximately 40 miles from Wheeler. Between 7:30 a.m. and 10:30 a.m. on August 19, 1994, a number of individuals witnessed a white mid-size car with two young white males inside driving slowly in the vicinity of a branch bank in Holcombe. At 10:30 a.m., the lone teller in this bank witnessed a white male in his early twenties enter the bank holding a six-inch knife pointed up in the air. According to the teller, the man was approximately 5' 7", had a medium-to-thin build, wore dark sunglasses with a bandanna tied over his hair, and wore brown gloves and a black leather coat that was tight around the waist. The robber said he was there "to make a withdrawal" and proceeded to go behind the teller counter, open a money drawer, take $15,359 in cash, and then leave the bank. Witnesses outside then observed a slender, six-foot-tall white male wearing a short black coat running south from the bank towards the woods. The white car observed earlier was also seen driving out of town but this time with only one male in it.

Later that day around noon, Smith and the friend who had purchased the Pontiac 6000 bought a van for $3,000. They paid for the van in cash and purchased it from the mother of Smith's getaway driver in the Wheeler robbery. Finally, when Smith was later in-carcerated on other charges, he described in some detail his role in both the Wheeler and Holcombe robberies to two fellow inmates, both of whom testified at Smith's trial.

Smith was tried and convicted by a jury. In sentencing Smith, the District Court found an Offense Level of 30 and a Criminal History Category of IV, suggesting a sentence of 135 to 168 months under the United States Sentencing Guidelines (USSG). The District Court imposed a sentence of 168 months and ordered Smith to pay $20,309 in restitution. The calculated Offense Level included a two-point enhancement for obstruction of justice under USSG § 3C1.1. The court enhanced the sentence because it found that Smith perjured himself by testifying at trial that the money he used to buy the van on the day of the Holcombe robbery was in fact money left over from the Wheeler robbery. Smith now appeals.

## II. ANALYSIS

### A. Admission of Evidence of the Wheeler Robbery

Smith first argues that the District Court should not have admitted evidence of the Wheeler bank robbery at his trial for the Holcombe robbery. The court rejected Smith's motion *in limine* and admitted the evidence under Federal Rule of Evidence 404(b). We review the admission of the evidence under Rule 404(b) only for an abuse of discretion. *United States v. Zapata*, 871 F.2d 616, 621 (7th Cir.1989).

Federal Rule of Evidence 404(b) generally prohibits the introduction of a defendant's past crimes as evidence that the defendant acted similarly on a separate occasion. Although a defendant's past criminality may well have some probative worth concerning whether the defendant acted criminally at a later date, the probative value of this evidence will be relatively small and the risk of its misuse by the factfinder will be great. Rule 404(b) thus categorically prohibits evidence of other bad acts offered "to prove the character of a person." *See generally* Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 100 (2d ed. 1994).

Rule 404(b) makes exceptions, however, for evidence offered to prove specific points other than a defendant's criminal propensity. When *who* committed a crime is at issue, for example, Rule 404(b) says evidence of other crimes "may be admissible" to show identity. The most common form of evidence offered to prove identity is *modus operandi* evidence (i.e., evidence that shows a defendant's distinctive method of operation). The Government here offered the Wheeler robbery as evidence of Smith's *modus operandi*.

■ This court has combined the requirements of Rule 404(b) and Rule 403 to create a four-prong test that governs the admission of "other acts" evidence. The evidence of the other act must 1) be directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; 2) show that the other act is similar enough and close enough in time to be relevant to the matter in issue; 3) be sufficient to support a jury finding that the defendant committed the similar act; and 4) have probative value that is not substantially outweighed by the danger of unfair prejudice. *United States v. Mounts*, 35 F.3d 1208, 1214 (7th Cir.1994), *cert. denied*, ⸺ U.S. ⸺, 115 S.Ct. 1366, 131 L.Ed.2d 222 (1995).

The evidence that Smith committed the Wheeler robbery clearly passes the first prong because the central issue at trial was who robbed the Holcombe bank. The third prong is also easily satisfied because Smith had already pleaded guilty to the Wheeler robbery. The second and fourth prongs, however, raise more nettlesome issues that recur in cases where the prosecution offers *modus operandi* evidence.

■ If defined broadly enough, *modus operandi* evidence can easily become nothing more than the character evidence that Rule 404(b) prohibits. The question is obviously how general a court's focus should be when judging the similarity of criminal acts. We have said that *modus operandi* evidence must bear "a singular strong resemblance to the pattern of the offense charged," *United States v. Shackleford*, 738 F.2d 776, 783 (7th Cir.1984), and that the similarities should be "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof," *Unit-*

*ed States v. Hudson*, 884 F.2d 1016, 1021 (7th Cir.1989). The focus here, therefore, should be on whether the similarities between the other acts evidence and the charged crime clearly distinguish the defendant from other criminals committing the same crime.

We think that the commonalities of the Wheeler and Holcombe robberies are sufficiently idiosyncratic to uphold the trial court's discretionary decision to admit the evidence of the Wheeler robbery. Numerous similarities make the two robberies clearly distinctive from the thousands of other bank robberies committed each year. First, both robberies were committed by young white males with slender builds. Second, both robbers employed another person to drive them to the bank. Third, both brandished knives (hardly the typical weapon for a holdup man) and held the knives vertically in the air as they robbed the banks. Fourth, both moved behind the bank counter to get the money themselves rather than demanding money from the teller. Fifth, both robbers targeted small, sparsely-staffed bank branches. Sixth, the robberies were close together in time. The one month interval between the robberies is certainly less than the multi-year gaps between crimes that we have allowed in other 404(b) cases. *See, e.g., United States v. Kreiser*, 15 F.3d 635, 640 (7th Cir.1994); *United States v. Goodapple*, 958 F.2d 1402, 1407 (7th Cir.1992). And seventh, the robberies were close together geographically. Geographic proximity is certainly relevant to 404(b) analysis, *see United States v. Trenkler*, 61 F.3d 45, 54 (1st Cir.1995), and the 40 mile distance between the two banks is small, especially when considered in the context of rural northwest Wisconsin. Compared to a prior robbery in, say, southwest California, Smith's prior robbery so close to Holcombe suggests a *modus operandi* and strengthens the inference that it was Smith who robbed the Holcombe bank.

■ Given this string of distinctive similarities, the evidence of the Wheeler robbery is solidly probative that Smith also committed the Holcombe robbery. Indeed, the evidence is strong enough that we do not think the risk of unfair prejudice substantially out-

weighed the evidence's probative worth. Moreover, this risk of unfair prejudice was lessened by the jury instruction (given pursuant to Federal Rule of Evidence 105) that other acts by Smith were relevant only to the issue of identity in the charged offense. The District Court thus did not abuse its discretion by admitting the Wheeler robbery evidence.

*B. Jury Instructions and Sufficiency of the Evidence for Armed Bank Robbery (18 U.S.C. § 2113(d))*

■ Smith next argues that the jury instructions concerning the elements of armed bank robbery were erroneous. Section 2113(a) of Title 18 concerns the taking of money from banks "by force and violence, or by intimidation." If the robber also "by the use of a dangerous weapon or device" either 1) assaults any person, or 2) puts in jeopardy the life of any person, then § 2113(d) enhances the maximum sentence by five years.[1]

Smith's indictment charged only that Smith "put in jeopardy" the life of another person, not that he "assaulted" anyone. The District Court instructed the jury that the "put in jeopardy" element is met "when a robbery victim is placed in an objective state of danger by the use of the dangerous weapon." The District Court further instructed the jury that an "objective state of danger" means that "an average person would think that his or her life was in jeopardy." Smith argues that the court should have accepted his proposed jury instruction which would have defined the "put in jeopardy" element without reference to the reaction or mental state of victims.[2] Smith's proposed instruction, in other words, would define the "put in jeopardy" element by the actual increased risk of death rather than by what an average or reasonable victim would think during the robbery.

The question of what exactly § 2113(d) requires the Government to prove has perplexed courts (including this one) for years. *See United States v. Benson,* 918 F.2d 1, 3–4 (1st Cir.1990) (collecting cases). Much of the confusion has stemmed from the difference, if any, between the "assault" and the "put in

---

1. 18 U.S.C. § 2113(a) reads in relevant part:

   Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, management, or possession of, any bank, credit union, or any savings and loan association ...

   ...

   Shall be fined under this title or imprisoned not more than twenty years, or both.

   18 U.S.C. § 2113(d) reads:

   Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined under this title or imprisoned not more than twenty-five years, or both.

   The Supreme Court has held that the phrase "by the use of a dangerous weapon or device" modifies both the phrase "puts in jeopardy the life of any person" and the phrase "assaults any person." *Simpson v. United States,* 435 U.S. 6, 11 n. 6, 98 S.Ct. 909, 912 n. 6, 55 L.Ed.2d 70 (1978).

2. Smith requested the pattern jury instruction from Edward J. Devitt et al., *Federal Jury Practice and Instructions* § 49.08 (4th ed. 1990):

   The phrase "puts in jeopardy the life of any person" means to knowingly do an act which exposes a person to a risk of death.

   The term "dangerous weapon or device" means any object that can be used by one person to inflict severe bodily harm or injury upon another person.

   "Puts in jeopardy the life of any person by the use of a dangerous weapon or device" means, therefore, to expose a person to a risk of death or severe bodily harm by the use of a weapon or device that is capable of inflicting death or severe bodily harm.

   The Magistrate Judge disagreed, and the District Court instead instructed the jury as follows:

   As I previously instructed you, the government must prove beyond a reasonable doubt that the defendant, in committing this bank robbery, put in jeopardy the life of another person by the use of a dangerous weapon. A "dangerous weapon" means any instrument or device capable of inflicting serious bodily injury or causing the death of another person. Both the physical capabilities of the object used and the manner in which the object is used may be considered by you in determining whether the object is a "dangerous weapon."

   The phrase "put in jeopardy the life of any person" means to knowingly do an act which exposes a person to risk of death. The "put in jeopardy" element is met when a robbery victim is placed in an objective state of danger by the use of the dangerous weapon.

   An "objective state of danger" means that an average person would think that his or her life was in jeopardy.

jeopardy" provisions of § 2113(d). The Ninth Circuit has stated that the distinction is "elusive" and that the "put in jeopardy" provision "may well include" the "assault" provision. *United States v. Coulter*, 474 F.2d 1004, 1005 (9th Cir.1973). We apparently have done little since the 1970s to reduce the confusion. In drafting the jury instructions for this case, the District Court relied upon *United States v. Roustio*, 455 F.2d 366 (7th Cir.1972). In that case, we seem to have confounded the two provisions, stating that the "put in jeopardy" language requires that "the life of the person *assaulted* must be placed in an objective state of danger." *Id.* at 371 (emphasis added). And rather than focusing on the objective state of danger, we then held that a victim's reasonable apprehension of harm—an idea normally associated with assault—was sufficient to satisfy the "put in jeopardy" element. *Id.* at 371–72. We subsequently applied this same analysis in *United States v. Richardson*, 562 F.2d 476 (7th Cir.1977).

In hindsight and with the benefit our sister circuits' consideration of the issue, we now think the focus of the "put in jeopardy" analysis should be on the actual risk created by the robber's use of a dangerous weapon. The reasonable fears of victims are more appropriately considered when a defendant is charged under the "assault" provision of § 2113(d). *See United States v. Rizzo*, 409 F.2d 400, 402–04 (7th Cir.1969) (discussing elements of assault). Although this clarification should be helpful to district courts composing jury instructions, it may ultimately have little practical consequence for two reasons. First, the Government has the freedom to charge a defendant under either or both provisions of § 2113(d). Second, the two standards will rarely, if ever, lead to different outcomes in specific cases. The Supreme Court has defined broadly the danger that can flow from the use of weapons in bank robberies. *See McLaughlin v. United States*, 476 U.S. 16, 17–18, 106 S.Ct. 1677, 1678, 90 L.Ed.2d 15 (1986) (holding that unloaded handguns are "dangerous weapons"

under § 2113(d)). The mere "display of a gun instills fear in the average citizen; as a consequence, it creates an immediate danger that a violent response will ensue." *Id.* Any use of a dangerous weapon that qualifies as an assault (by creating reasonable fear in victims) would therefore almost always put lives in jeopardy if only because of the risk of a violent response. *See, e.g., Benson*, 918 F.2d at 3–4 (holding that even a mock gun can put lives in jeopardy because of possibility of violent response); *United States v. Martinez–Jimenez*, 864 F.2d 664, 667–68 (9th Cir.1989) (same). On the flip side, any use of a dangerous weapon that objectively puts lives in jeopardy will almost certainly create a reasonable fear in victims.[3]

■ In this case, Smith was indicted under the "put in jeopardy" provision of § 2113(d). Thus, only the actual danger created by his use of the knife should have been relevant at trial. We do not think Smith was prejudiced in any way, however, by the jury instruction that emphasized the fear of an average person. It was undisputed at trial that the robber (who the jury found was Smith) brandished a six-inch knife upon entering the bank and held it towards the teller when he came around the counter to steal the money. We do not see how a robber can throughout a robbery openly wield a weapon capable of doing immediate harm and not in the process put lives in jeopardy. Smith *might* have had an argument had he used an unloaded gun, which would have been physically incapable of inflicting harm. Even that weak argument is foreclosed, however; because knives are always capable of causing death. Smith also would have had an argument had he somehow "used" the knife without actually putting lives in jeopardy, say by jimmying a lock on a door. His flagrant and threatening display of the knife throughout the robbery, however, clearly increased the direct risk to the teller, not to mention the indirect risk of a violent response by a customer or the police. As the District of Columbia Circuit has held, "[I]f a defendant has

---

3. It is, of course, possible that a robber could put lives in jeopardy but nonetheless fail to scare a particular victim (even though fear would be a reasonable reaction). This hypothetical may fall outside the boundaries of the "assault" provision, but the Government obviously could still charge the robber under the "put in jeopardy" provision.

the capacity to murder, if he possesses a firearm or some other device capable of killing, during the commission of the robbery, and threatens someone with it, he has used that weapon or device to put lives in jeopardy and is therefore guilty of violating § 2113(d)." *United States v. Ray*, 21 F.3d 1134, 1142 (D.C.Cir.1994).

 We are therefore confident that the jury would have reached an identical verdict had it been instructed to consider only the objective danger created by Smith. Because we will reverse a conviction for faulty jury instructions "only if the jury's comprehension of the issues is so misguided that it prejudiced the complaining party," *United States v. Dack*, 987 F.2d 1282, 1284 (7th Cir.1993), the District Court's jury instructions are not grounds for ordering a new trial. Smith's contention that the evidence was insufficient to convict under § 2113(d) is likewise rejected.

*C. Sentence Enhancement for Obstruction of Justice*

Finally, Smith challenges the enhancement of his sentence for obstruction of justice. "To establish an obstruction of justice, the sentencing court must make an independent factual finding that the defendant engaged in a willful attempt to provide false testimony." *United States v. Sinclair*, 74 F.3d 753, 762 (7th Cir.1996). We will reverse such a finding by a district court only if it is clearly erroneous. *Id.*

The District Court's finding that Smith committed perjury is not clearly erroneous. Considering 1) that Smith had called his mother days before the Holcombe robbery asking for money, and 2) that Smith then showed up hours after the Holcombe robbery with $3,000 in cash to buy a van, it seems utterly believable to us that Smith was lying when he told the jury that the money was left over from the Wheeler robbery. We are certainly not left "with the definite and firm conviction that a mistake has been committed" as we would have to be to label this

clear error. *See United States v. Garcia*, 69 F.3d 810, 819 (7th Cir.1995).

Smith's conviction and sentence are AFFIRMED.