UNITED STATES of America, Plaintiff–Appellee,

v.

Jamel ROBINSON, Defendant–Appellant.

No. 98–2756.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 13, 1998.

Decided May 6, 1999.

Young B. Kim, Duane J. Deskins (argued), Office of the United States Attorney, Civil Division, Appellate Section, Chicago, IL, for Plaintiff–Appellee.

Gerald J. Collins (argued), Chicago, IL, for Defendant–Appellant.

Before CUMMINGS,[1] ROVNER, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Jamel Robinson robbed the North Shore Trust and Savings Bank in Waukegan, Illinois, and got caught. After a jury convicted him of a violation of 18 U.S.C. § 2113(a), he was sentenced to 63 months' imprisonment. He now attacks the district court's decision to admit certain evidence under Federal Rule of Evidence

---

1. Judge Cummings participated in the consideration of this case but died before the decision was rendered.

404(b) and the overall sufficiency of the evidence. Given the standard of review that applies to these kinds of arguments, they succeed in very few cases. Robinson's is no exception: we affirm.

## I

On the morning of March 4, 1996, a lone bank robber entered the North Shore Trust and Savings Bank ("North Shore Bank"). As he made his way through the lobby, he pulled a black ski mask down over his face. He then ignited several firecrackers and tossed them into the air, jumped over the counter separating the bank's lobby from the teller stations, and pulled out what appeared to be a semi-automatic handgun (but which in fact was a BB pistol). After warning teller Sara Gesky not to do anything stupid that might result in someone's getting hurt, the robber cleaned out her money drawer, stuffing the bills in an Aldi's supermarket bag. He then emptied Ramona Seals' teller drawer in the same way. After collecting approximately $8,000, the robber jumped back over the counter and ran through the lobby and out of the bank. He sprinted across the bank's parking lot and jumped over a chain-link fence separating the lot from the neighboring schoolyard, dropping his ski mask as he went.

State and federal investigators soon accumulated what defense counsel himself described at oral argument as "tremendously strong circumstantial evidence" linking Robinson to the robbery. First, tellers Gesky, Seals, and Lauren Sczygielski gave general descriptions of the robber, even though none of them (nor any other employee or customer) saw his face. Gesky and Seals described the robber as an African–American male between 5'7" and 5'9" in height. In addition, Gesky recalled that the robber had been wearing a brown vest, black jacket, dark jeans, and gloves. Sczygielski, who hid underneath a desk during the robbery, added that the robber, whom she described as over six feet tall, had been wearing white tennis shoes. Investigators lifted two shoe prints from the counter in the bank lobby and recovered a dark green vest, a blue glove, and a Marksman Repeater BB pistol from the schoolyard and the dead-end street on the other side of the fence.

Another important piece of the puzzle was furnished by Anthony Jeffers, who lived near the bank. On the morning of the robbery, Jeffers noticed through his kitchen window a man walking back and forth along the dead-end street adjacent to Jeffers' house. He watched the man walk over to a Chrysler New Yorker that was parked with its engine running, open the driver's side door, reach under the driver's side seat, and close the door again. The man then walked away from the car, leaving the engine running, and proceeded to jump over the fence separating the dead-end street from a schoolyard and the parking lot of the North Shore Bank. Finding this behavior suspicious, Jeffers wrote down the New Yorker's license plate number. Approximately 15 or 20 minutes later, Jeffers saw the man running back across the schoolyard toward the street, discarding various items as he went. The man jumped over the fence, got into the New Yorker, and drove away. Jeffers called 911 and passed along his information.

The New Yorker belonged to Robinson's grandmother, Janice Phillips, with whom he was living at the time. She informed investigators that her car keys and garage door opener had been missing since that morning, and that Robinson himself was nowhere to be found. With Phillips' permission, the agents searched Robinson's room in the basement. There they found a firecracker, an empty fireworks package, and a letter in handwriting later identified as Robinson's. The letter explained that Robinson wanted money because his child needed him, and that "the reason [he] chose] to do what [he had] to do to get money is because [he had] got to a point in [his] life where [he had] to go for it." The last line of the letter reads: "Love you

Britney." The "Britney" of the letter was Robinson's daughter with former girlfriend Ruth Haller. Phillips also gave investigators one of the Aldi's shopping bags she kept in her kitchen cabinet and a pair of white tennis shoes that belonged to Robinson.

Phillips' car was found several weeks later abandoned in the parking lot of a motel at which Robinson previously had stayed with a girlfriend. By then, Robinson himself was long gone. On the afternoon of March 4, 1996, Robinson had purchased a one-way Amtrak ticket from Chicago to San Diego. Two days after he arrived in San Diego, he moved in with ex-girlfriend Haller and Britney. While there, Robinson showed Haller approximately $3,000 in cash and confessed that he had robbed a bank so that he could come to visit her and Britney.

In addition to the evidence summarized above, the government's case at trial also included a forensics report concluding that the shoe prints left on the counter at North Shore Bank were produced by shoes of the same size and design as the ones Phillips gave to the investigators. Several witnesses testified that Robinson owned more than one pair of the same white tennis shoes. The government also called as a witness Dawn Runge, another of Robinson's ex-girlfriends with whom he also has a child. Runge testified primarily about two conversations that she had with Robinson. The first, which took place about two-and-a-half weeks prior to the robbery, concerned Robinson's complaints about not having enough money. The second conversation revealed Robinson's interest some six months earlier in robbing a different bank.

What was missing from the government's case was any eyewitness testimony or physical evidence placing Robinson at the scene of the crime. None of the government's witnesses could positively identify Robinson as the bank robber. Moreover, the government's forensics expert testified that the only hairs found in the ski mask allegedly worn by the robber did not belong to Robinson and that carpet fibers found on the glove and vest did not match the carpet in Phillips' house. Thus, while there was significant circumstantial evidence pointing to Robinson as the robber, there was no direct evidence.

## II

Robinson raises two issues on appeal. He first challenges the district court's decision to permit Runge to testify about the earlier bank robbery conversation. According to Runge, sometime in October or November 1995, she and Robinson drove together to the Bank of Waukegan so that she could deposit money for her employer. Robinson was in a bad mood that day, Runge testified, because he did not have as much money as he felt he deserved. Robinson waited in the car while Runge went in to make the deposit. When Runge returned to the car, Robinson said, "Come on, baby. Let me rob the bank. You can drop me off here." He assured her that they would get away with the robbery because "nobody would suspect a white girl" and that it would be easy for him to get in and out of the bank. He then wiggled his hands in his pockets and stated that he had what he needed to commit such a robbery. Runge told Robinson that she would have no part in his plan and he dropped the subject.

Robinson argues that Runge's testimony should have been excluded under Federal Rule of Evidence 404(b) because it constitutes evidence of a prior bad act offered for the purpose of proving Robinson's criminal character and prejudicing the jury against him. The district court disagreed, finding the evidence admissible for the purposes of proving intent, identity, and motive. As with other evidentiary rulings, we generally review the admission of Rule 404(b) evidence for an abuse of discretion. *United States v. Robinson*, 161 F.3d 463, 466 (7th Cir.1998). Here, however, the plain error standard applies, be-

cause Robinson never mentioned Rule 404(b) below. *See United States v. Huels*, 31 F.3d 476, 479 (7th Cir.1994). He challenged only the relevancy of the testimony before the district court and did not object when the court, *sua sponte*, decided to invoke Rule 404(b). He must therefore show that there was error, it was plain, and that it affected his substantial rights. *United States v. Ross*, 77 F.3d 1525, 1538 (7th Cir.1996).

Rule 404(b) generally prohibits the introduction of evidence of other crimes, wrongs, or acts committed by a defendant for the purpose of proving that the defendant has a propensity to commit such acts. Fed.R.Evid. 404(b); *Robinson*, 161 F.3d at 466. Such evidence may be admissible for other purposes, however, such as to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Robinson*, 161 F.3d at 466; *United States v. Smith*, 103 F.3d 600, 603 (7th Cir.1996). We apply a four-part test to determine the appropriateness of admitting evidence of prior bad acts, under which we ask whether: (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the evidence has probative value that is not substantially outweighed by the danger of unfair prejudice. *Robinson*, 161 F.3d at 166; *Smith*, 103 F.3d at 603.

The court found that Runge's testimony tended to prove Robinson's intent, identity, and motive. Robinson disagrees, claiming that it showed only "the daydreams of a frustrated youth." Robinson also argues that the conversation was too remote in time from the actual robbery to be useful for the purposes of establishing identity and that the two incidents do not share a single *modus operandi*.

There was no error, plain or otherwise, in the district court's conclusion that a jury might find that Robinson's comments to Runge reflected more than his daydreams. Whether or not it revealed his *modus operandi*, it also tended to show that Robinson had developed a plan for robbing a bank that he believed could be carried out quickly and easily, and that he possessed the tools that he felt would be necessary to accomplish the crime. *See United States v. Lloyd*, 71 F.3d 1256, 1265 (7th Cir.1995) ("[W]hen evidence is offered to prove intent, the degree of similarity is relevant only insofar as the acts are sufficiently alike to support an inference of criminal intent."). It also supplies a motive for bank robbery: Robinson thought this was a quick and easy way to solve his financial problems. True, the plan was temporarily put on hold and almost six months passed before the North Shore Bank robbery. This time lapse was not enough, however, to require the judge to exclude the evidence. *See United States v. Runnels*, 93 F.3d 390, 393 (7th Cir.1996) (six years between prior act and charged offense); *Lloyd*, 71 F.3d at 1264 (one year between prior act and charged offense).

Robinson also attacks Runge's credibility as a witness, but as we repeatedly note, credibility questions are for the jury, and we will not second-guess its determinations. *United States v. Owens*, 145 F.3d 923, 927 (7th Cir.1998); *United States v. Freland*, 141 F.3d 1223, 1226 (7th Cir.1998). He was able to portray her as a scorned woman seeking revenge against the man who abandoned her and their daughter, and the jury presumably took this into account when it credited her story.

Finally, Robinson asserts that whatever probative value Runge's testimony may have is outweighed by its prejudicial effect. This point seems to go to the district court's decision to let the jury learn those very facts about Runge. Robinson suggests that the jury probably de-

veloped a negative impression of Robinson because it found out that he had fathered two children out of wedlock with two different women and had not supported either of them. Robinson may have invited some of this, but in any event, the proper balance between prejudice and probative value in these situations is a classic trial judge call, and we see no reason to disturb the district court's decision here.

### III

Robinson next argues that the government's evidence against him was insufficient to support a finding of guilt beyond a reasonable doubt. In the end, however, this boils down to a complaint that the evidence was entirely circumstantial. It is well established that a jury's verdict may rest solely upon circumstantial evidence. *United States v. Todosijevic*, 161 F.3d 479, 483 (7th Cir.1998); *United States v. Stockheimer*, 157 F.3d 1082, 1087 (7th Cir.1998). Indeed, "there is nothing novel about establishing a crime through the use of circumstantial evidence.... Case law recites that circumstantial evidence is not less probative than direct evidence, and, in some cases is even more reliable." *United States v. Hatchett*, 31 F.3d 1411, 1421 (7th Cir.1994), quoting *United States v. Rose*, 12 F.3d 1414, 1417 (7th Cir.1994).

Looking at the entire record in the light most favorable to the government, we have no trouble concluding that this jury acted rationally when it found Robinson guilty. *See United States v. Menting*, 166 F.3d 923, 927 (7th Cir.1999); *United States v. Granados*, 142 F.3d 1016, 1019 (7th Cir. 1998). Robinson argues that regardless of whether circumstantial evidence in general may be sufficient to support a conviction, the circumstantial evidence here is so flawed that no reasonable jury could rely on it. Once again, however, this is just another credibility challenge to Haller and Runge, which cannot succeed. Robinson also notes that there was some evidence that did not conclusively point to him, such as the facts that the hair found in the ski mask did not match his hair and the carpet fiber found on the discarded clothing did not match the carpet in Phillips' house. At most, though, this shows that it may be possible to concoct an alternative theory under which another individual is responsible for the crime. This is not enough to undercut the jury's verdict here. Our inquiry is limited to the question whether a reasonable jury could find beyond a reasonable doubt that Robinson is responsible. Because we find that a reasonable jury could reach such a conclusion, and further that the admission of Runge's testimony under Rule 404(b) was not plain error, we AFFIRM the conviction.