In the

# United States Court of Appeals
## For the Seventh Circuit

No. 08-2207

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ALAN L. SIMMONS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 07-CR-30—**Lynn Adelman**, *Judge.*

ARGUED FEBRUARY 25, 2009—DECIDED SEPTEMBER 11, 2009

Before FLAUM, WILLIAMS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Alan Simmons was convicted on three federal charges: conspiracy, armed bank robbery, and use of a firearm during a crime of violence. He appeals the conviction and his sentence, and argues that improper conduct by government prosecutors should have led the district court to grant a mistrial. We disagree and affirm his conviction and sentence.

## I. Background

Alan Simmons was convicted of being the mastermind behind a Cedarburg, Wisconsin bank robbery. His friend Antonio Mann and cousin Mark Campbell actually robbed the bank, but Simmons was in phone contact with them throughout the heist. The scheme was hatched by Mann, whose girlfriend Jackie Schmidt worked at the bank. Schmidt had described the bank in detail, its security precautions (or lack thereof) and related that robbing the bank would be easy. Mann relayed the information to Simmons, who hooked him up with Campbell, but only after "interviewing" two other potential accomplices, neither of whom panned out for this bank job.

Simmons, Mann, and Campbell all took a first crack at the bank on December 29, 2004, when it was closed (actually, this was more of a burglary than a robbery), using a duplicate key that Mann had made from Schmidt's key ring. Mann and Campbell went to the bank while Simmons, continuously monitoring Mann and Campbell through cell phone calls, acted as a lookout from a nearby ice cream stand (bringing along a girlfriend who testified at trial to his presence at the stand during the time of this attempt and who was apparently unaware of what was taking place at the bank while she bought her daughter ice cream and Simmons waited in the car). But this plan was a disaster: first, Mann fell through some ice into a creek when he tried to sneak up to the bank, and then, the key didn't work. So, the would-be thieves retreated, Mann to get into some dry clothes and the three of them to devise a new plan. For their

second effort they decided to take Schmidt from her apartment in the early morning and take her to the bank, with Simmons again serving as the lookout.

By the way, the degree of Schmidt's complicity, if any, in the crime is at issue. The government says the evidence showed she was abducted; Simmons argues that she was an accomplice. In any event, Simmons did not make it to the scene of this second attempt (he stayed home to watch his kids), but did participate in a series of phone calls with Mann over the course of the morning of the robbery, during the time that Mann assumed Simmons's lookout duties. The new plan involved having Schmidt open the door to the bank herself. At this point, Simmons argues, the robbery developed beyond the plan he had laid out and to which he had agreed.

What Mann and Campbell testified to at trial was that Campbell went to Schmidt's apartment at 3:30 a.m. wearing a mask and carrying an unloaded gun. He was supposed to take her to the bank to open the door at that point, but Schmidt informed Campbell that they would have to wait until later that morning so a co-worker could give them an additional code that would open the vault. Campbell waited in Schmidt's apartment for more than three hours, and then drove with Schmidt in her car to the bank. Mann, who was unaware of the change of plan, apparently circled the neighborhood for about three hours before arriving at the bank and seeing Campbell's car there. Schmidt let Campbell into the bank where they waited near the vault until Schmidt's co-worker Marlene Kasten arrived. Campbell threatened Kasten with

the unloaded gun and she gave him the vault code. Campbell opened the vault, grabbed $177,000, and then left Kasten and Schmidt at the bank with a warning not to call the police for at least five minutes as he fled with Mann. Mann and Campbell divided the money and gave Simmons $30,000 as part of his take in the robbery.

Eventually Mann and Campbell got caught and were charged with bank robbery. Despite their promises in recorded phone conversations from jail that they would not snitch (Mann directly to Simmons and Campbell through an intermediary), they flipped and testified against Simmons at his trial.

## II.  Procedural History

Simmons was charged with three counts: conspiracy, 18 U.S.C. § 371, armed bank robbery, 18 U.S.C. § 2113, and use of a firearm during a crime of violence, 18 U.S.C. § 924(c)(1)(A). As noted, Mann and Campbell testified at his trial, providing the most damning evidence against him. Their testimony was corroborated by an engineer from Sprint who reported on the high volume of calls between Simmons and Mann during the time of the robbery, calls which allowed the engineer to provide a pinpoint map of Mann's travels over the course of the morning of the robbery.

At the end of the trial, the prosecutor displayed a chart, summarizing the government's case, to the jury with photographs of all three robbers, including a picture of Simmons with the top part of his bright orange jail shirt visible. Defense counsel objected and asked for a

mistrial, but the district court instead implicitly overruled the mistrial motion and ordered the prosecutor to proceed after removing the chart from the jury's view.

Also relevant to the defendant's appeal is the prosecutor's statement during closing argument, when she said, "My only job here is not to defend Antonio Mann, but to compel him to tell you what happened." She also conceded that Campbell's credibility was compromised but that he "pled guilty" and "came clean." Defense counsel did not object at trial to these statements.

Simmons was convicted on all three counts and sentenced to 60 months on the conspiracy count and 96 months on the armed robbery charge, to be served concurrently, along with an additional 84 months on the use of a firearm count to be served consecutively, so that his total sentence of incarceration added up to 180 months.

His appeal challenges the sufficiency of the evidence on the robbery and firearm charges, the application of the abduction guideline to his sentence, and the district court's decision not to grant a mistrial for either the use of the photograph or the prosecutor's allegedly improper vouching during closing argument.

## III. Analysis

### A. Sufficiency of the evidence that a teller's life was put in jeopardy during the robbery

Because Simmons was charged specifically under the "in-jeopardy" prong of 18 U.S.C. § 2113(d), the prosecution

was required to prove beyond a doubt that there was an actual risk created by the robber's use of a dangerous weapon. 18 U.S.C. § 2113(d) (punishing anyone who "in committing . . . [a bank robbery], assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device . . . ."); *United States v. Smith*, 103 F.3d 600, 605 (7th Cir. 1996). The "in-jeopardy" prong is distinct from the "assault" provision of the same subsection, which requires only that the teller had a reasonable fear of imminent bodily injury. *Smith*, 103 F.3d at 605. In *Smith* we remarked that there may be little practical difference in charging the defendant under either the assault or in-jeopardy prongs of the offense, but our holding in that case requires us to consider the actions of a defendant charged with putting in jeopardy from an objective standpoint rather than from the perspective of the teller. *Id.* ("[W]e now think the focus of the 'put in jeopardy' analysis should be on the actual risk created by the robber's use of a dangerous weapon."). Simmons's conviction here depends on whether a rational jury could have found, on this record, that his co-conspirator, Campbell, created an objective risk to the teller's life when he threatened her with an unloaded gun. *See United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009).

Simmons argues that no one was actually in any objective danger from the robbery and any collateral danger that may attach to threatening a victim with an unloaded gun was absent here. Involvement of law enforcement was highly unlikely, he argues, because of the early morning hour of the robbery. Similarly, no customers

were in the bank because the robbery occurred before the bank opened. Therefore, Simmons argues, there is insufficient evidence upon which a rational jury could convict him of placing a teller's life in jeopardy.

In *Smith* we noted that the defendant in that case "*might* have had an argument had he used an unloaded gun, which would have been physically incapable of inflicting harm." *Smith*, 103 F.3d at 605 (emphasis in the original). But, we also characterized that argument as "weak." *Id.* We also mentioned in *Smith*, when discussing how to apply the in-jeopardy prong of the inquiry, that other circuits have found that an unloaded handgun is a dangerous weapon because "it creates an immediate danger that a violent response will ensue." *Id.* (citing *McLaughlin v. United States*, 476 U.S. 16, 18 (1986)). "Any use of a dangerous weapon that qualifies as an assault (by creating reasonable fear in victims) would therefore almost always put lives in jeopardy if only because of the risk of a violent response."*Id.*

This case, of course, would be simpler if the defendant were simply charged under the assault provision of § 2113(d), which carries the exact same penalty. But, even so, we think the evidence was sufficient to convict Simmons on the in-jeopardy provision. The First and Ninth Circuits have found that the use of fake guns placed lives in jeopardy because of the risk of a violent response by law enforcement. *See United States v. Benson*, 918 F.2d 1, 3 (1st Cir. 1990) (finding defendant's statement that the bulge in his jacket was a gun put lives in jeopardy); *United States v. Martinez-Jimenez*, 864 F.2d 664,

666-67 (9th Cir. 1989) (finding that defendant's use of a toy gun put lives in jeopardy). We find their analyses persuasive. The defendant points out that the robberies considered by those courts occurred during daylight hours and therefore the risk of law enforcement involvement was greater. However, there certainly was a risk of law enforcement involvement here; simply because the police did not show up does not mean there was no risk of them doing so. Adopting the view that the potential violent reaction of the victim or law enforcement is enough to meet the in-jeopardy requirement, we find that such a potential existed in this case. Campbell held Marlene Kasten at gunpoint in the bank a little before 7:00 a.m. There was a risk that this situation could have provoked a desperate response from Kasten or attracted the attention of the police. We therefore hold that sufficient evidence existed for a jury to find that Kasten's life was in jeopardy when Campbell pointed the gun at her, even though the gun was empty, and his conviction on the armed bank robbery count is affirmed.

### B.  Foreseeability of the use of a firearm in the robbery

Of course, Simmons, the subject of our appeal, was not at the scene of the completed robbery. Nonetheless he can be liable as a conspirator. Such conspiracy liability is dependent, though, on his actual knowledge of his co-conspirator's actions or whether those actions were reasonably foreseeable. *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946). Simmons argues that there was insufficient evidence for a rational jury to find that he could

have foreseen that the robbery would have involved the use of a firearm. Simmons bases this argument on the idea that Jackie Schmidt, Mann's girlfriend, was a willing participant in the bank heist. (This argument will surface again, in the context of sentencing.) Simmons argues that a gun would not be needed in the robbery because, according to the plan, no one was supposed to be in the bank and Schmidt was not being coerced.

The government points out that the evidence showed that the first failed attempt involved the use of a gun, and that Simmons acted as a lookout during this event. Simmons's job was to alert Mann to anyone entering the bank so Mann could "lay them down" and "tape them up." We agree with the government that the jury could infer from that testimony that the use of a gun was a part of the plot all along.

Furthermore, Simmons was involved in the reformulation of the plan, this time to grab Schmidt and take her to the bank; his absence from his lookout post was due to an unexpected wrinkle with his childcare arrangements (at least unexpected to his co-conspirators). Evidence that Simmons had actual knowledge of the gun used in the second robbery included the fact that he was in repeated contact with Mann, who provided the gun, throughout the robbery, including after the original plan of grabbing Schmidt at 3:30 a.m. had changed to driving her to the bank later in the morning. The same gun was used in both the attempt and the successful robbery. Mann informed Simmons over the phone at the exact moment Campbell entered the bank.

The jury also heard evidence at trial that Schmidt was abducted from her house, and was not a willing participant in the robbery. Kasten testified that Schmidt appeared "shaken" and fumbled while entering in the vault code. Campbell, Simmons's co-conspirator, testified that Schmidt was shaken, and that he and Mann had originally planned to "steal" the key to the bank from Schmidt's key ring without her knowledge. And Mann testified that the plan was for Campbell to "abduct" his girlfriend.

Other testimony, as Simmons points out, tends to show something less than coercion, but there was ample evidence on both sides of the issue. And Schmidt did not testify. The jury was entitled to choose between two credible versions of the facts and conclude that Schmidt was not in on the plot. *See United States v. Williams*, 553 F.3d 1073, 1080 (7th Cir.) *cert. denied* 129 S. Ct. 2452 (2009). If so, it was rational for the jury to infer, given the use of the gun in the original plan, that a gun would be used to abduct her. Or even if the jury believed that Schmidt was a willing co-participant, they were entitled to infer that the plot involved the use of the gun inside the bank. It was certainly handy in compelling Kasten's compliance with commands. The conviction on the firearm count, therefore, must also stand.

## C. Prosecutor's use of the mug shot

Simmons argues that the district court abused its discretion in denying his request for a mistrial after the government displayed a demonstrative chart during final

argument that pictured Simmons in jail clothes. At the outset, we should note that we review the judge's decision for an abuse of discretion. *See United States v. Cheska,* 202 F.3d 947, 953 (7th Cir. 2000).

We have, in limited circumstances, approved the use of mug shots at trial, but the use must be justified by the government's "demonstrable need to introduce the photographs." *United States v. Castaldi*, 547 F.3d 699, 704 (7th Cir. 2008). The government concedes that it had no demonstrable need for the use of Simmons's mug shot and it erred in showing it to the jury. The trial court agreed after defendant's objection and ordered the government not to use the photograph; the government made no further use or mention of it. But, the trial court did not conclude that the prejudice engendered by the photograph's use required a mistrial. This decision was not an abuse of discretion. It is not clear from the record how long the offending photo was on display to the jurors, but it does not appear to have been before them for an extended period of time. It would have required a real discerning juror to have been able to identify the photo as a mug shot anyway. It was a "head and shoulders" shot of Simmons, displaying only the neckline of an orange shirt, but contained no date or other markings identifying the clothing or the photo as coming from the jail. Simmons posits that a photo of Campbell in a similar shirt was also on the demonstrative chart and that when he and Mann testified, they were both wearing similar orange jail outfits. Of course, folks who are regularly around the criminal justice process would probably recognize the distinctive color of even a portion

of this jail garb, but it is doubtful that a member of the general public would be so insightful. And it was no secret that Simmons and his cohorts had been arrested—he was on trial for bank robbery charges. But even assuming that the jury understood this photo to have been one of Simmons in jail attire, the court's decision to complete the final arguments was not error.

A decision to declare a mistrial would have been appropriate if the brief glimpse of the photograph deprived the defendant of a fair trial. *United States v. Danford*, 435 F.3d 686, 686 (7th Cir. 2005). The trial court was in a better position to judge the error's effect than we are. *Cheska*, 202 F.3d at 953. Since the trial judge corrected the error immediately, the harm was negligible. Furthermore, the government points out that Simmons's counsel alluded to his client's past criminal history in order to explain the purchases Simmons made after the robbery. While the use of mug shots is disfavored and usually impermissible, there is no rule requiring an automatic mistrial based on their use. *See Castaldi*, 547 F.3d at 704-05. The decision to proceed was appropriately made within the trial judge's discretion. We do, however, emphasize that the use of the mug shot was improper and note that an easy way to ensure that an issue like this does not arise is for the parties to share their demonstrative exhibits with each other before they are used. This will allow all parties to avoid both potential prejudice and needless litigation.

### D. Improper Vouching

The standard of review on this claim is plain error, because defense counsel did not object at trial to the prosecutor's closing statement. *See* Fed. R. Crim. P. 52(b). To order a new trial, we must find that there was error that is plain that affects substantial rights. *Johnson v. United States*, 520 U.S. 461, 467 (1997). Furthermore, the error must have seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Id.*

The questionable statements the prosecutor made were these: "My only job here is not to defend Antonio Mann, but to compel him to tell you what happened" and "[Campbell] lied to the police too when he was arrested . . . . But once he pled guilty he came clean, he told what happened." The question is whether the prosecutor acted as a sort of character witness for Mann and Campbell either by stating that it was her personal opinion that the two robbers were being truthful or by implying that she had knowledge of reasons for their truthfulness to which the jury was not privy.

Simmons argues that the prosecutor invoked the power of her office to bolster Mann's credibility. Instead of judging his demeanor and weighing the evidence against corroborating details, the jury was encouraged to trust Mann, the argument goes, because the government lawyer believed he was telling the truth. Simmons's other argument is that the prosecutor, by invoking Campbell's plea deal, implied the government had compelled Campbell to be honest. Reduced to the basic terms, Simmons's argument is that the prosecutor improperly

connected the jury's trust of the two witnesses with its trust of the United States.

We have refused to find error where a prosecutor told the jury that guilty people don't plead guilty, *United States v. Robinson*, 8 F.3d 398, 416 (7th Cir. 1993), where a prosecutor characterized defendant's testimony as "the most ridiculous thing I've ever heard," *United States v. Della Rose*, 403 F.3d 891, 906 (7th Cir. 2005), or where a prosecutor said "we found the gun." *United States v. Joy*, 192 F.3d 761, 768-70 (7th Cir. 1999). Simmons claims this case is more like *United States v. DiLoreto*, 888 F.2d 996, 998-99 (3d Cir. 1989), where the Third Circuit reversed for a new trial after the prosecutor said, "We don't take liars. We don't put liars on the stand. We don't do that." But, at the time of *DiLoreto*, prosecutorial error of that nature was grounds *per se* for a mistrial. The Third Circuit has since abandoned that approach. *See United States v. Zehrbach*, 47 F.3d 1252, 1264 (3d Cir. 1995). The Third Circuit now adopts a standard harmless error analysis to improper prosecutorial statements that is more akin to our approach, *see United States v. Morris*, 498 F.3d 634, 638 (7th Cir. 2007), but did not overrule the underlying principle that the vouching in *DiLoreto* was improper, *Zehrbach*, 47 F.3d at 1264.

The question, then, is whether the prosecutor's statements lent the government's weight to the witnesses' testimony and if they did, whether that error was outweighed by the entire context of the record. *See Morris*, 498 F.3d at 638. Here, we can dispose of this issue looking

only at the second part of the analysis.[1] Even if the prosecutor improperly bolstered Mann's and Campbell's testimony, the record shows that there was substantial corroborating evidence: phone records from the morning of the robbery, cell phone records and corroborating testimony from a witness about the botched first attempt, Simmons's post-robbery spending spree (with no legitimate source of the large cash outlays), and recorded jail cell phone conversations in which Mann and Campbell vowed not to snitch. The prosecutor's passing comments in argument were small in comparison with the larger mosaic of evidence arrayed against Simmons. The district court, accordingly, did not abuse its discretion in failing *sua sponte* to order a mistrial.

### E.  Imposition of the Abduction Guideline

Finally, Simmons argues that before choosing to apply U.S. Sentencing Guideline § 2B3.1(b)(4)(A) (applying

---

[1] Our previous cases seem to indicate that we must always determine whether the prosecutors' statements were improper, but we choose to heed the Supreme Court's warning that rigid two-step protocols can sometimes lead to "bad decision-making." *See Pearson v. Callahan*, 129 S. Ct. 808, 820 (2009). When, as in this case, the case can be easily disposed of in the second prong of the analysis, we think that unnecessarily considering the first prong can do more harm than good. *Id.* (noting the limited precedential value, the awkward position of a party seeking review, the tendency of the second step to color perceptions of the first, and the waste of judicial resources when a court decides an issue unnecessary to the outcome of a case).

abduction enhancement if "any person was abducted to facilitate commission of the offense") to his sentence, the district court should have made a specific finding that the abduction of Schmidt was foreseeable to Simmons. Simmons, as noted, could only be sentenced for the foreseeable conduct of his co-conspirators. U.S.S.G. § 1B1.3(a)(1)(B) (A defendant's offense level, for sentencing purposes, shall be determined on the basis of, "in the case of a jointly undertaken criminal activity . . . all reasonably foreseeable acts and omissions of others in furtherance of the [joint undertaking]."). We review the adequacy of a district court's findings *de novo*. *United States v. Thompson*, 286 F.3d 950, 957 (7th Cir. 2002).

At sentencing, Simmons challenged Jackie Schmidt's role in the robbery and argued that she was a conspirator. If she was, he argued, there could be no application of the abduction guideline. The district court found that the abduction did take place. As the district court noted at sentencing, "the strongest evidence that Schmidt was not in on the plan at the time that she was abducted is the timing." In other words, had Schmidt been involved, Campbell would not have had to sit and wait at her apartment for three hours, while Mann drove the streets of Cedarburg, to wait for Schmidt's co-worker to arrive at the bank. Simmons argues now that this finding is not sufficient because the district court did not specifically declare that Schmidt's abduction was "foreseeable" to Simmons.

But, all the evidence at trial showed that Simmons was involved in the second plan, the one in which the

robbers agreed to abduct Schmidt. Finding that an actual abduction took place necessarily involved a finding that such an abduction was foreseeable, and in fact, planned by Simmons. The judge's reliance on the timing reinforces this point. The timing was a part of the original plan to which Mann, Simmons, and Campbell had agreed. Remember, Simmons was unexpectedly unavailable at the agreed-upon time to rob the bank because of baby-sitting duties. Therefore, in addition to supporting the notion that the abduction took place, the evidence of the botched timing also supports the notion that the abduction was foreseeable to Simmons. The application of this enhancement was, therefore, proper.

## IV. Conclusion

For the foregoing reasons, we AFFIRM the defendant's conviction on all three counts and his sentence.